# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

—————————————————————
|  |  |  |
|---|---|---|
| | : | |
| UNITED STATES ex. rel. | : | JURY TRIAL DEMANDED |
| DR. ABRAHAM SCHEER | : | |
| | : | |
| Plaintiff | : | CIVIL ACTION NO. 2:20-cv-6117 |
| v. | : | |
| | : | FILED IN CAMERA AND UNDER |
| BEEBE HEALTHCARE | : | SEAL PURSUANT TO 31 U.S.C. |
| | : | §3730(b)(2) |
| and | : | |
| BEEBE MEDICAL GROUP | : | |
| and | : | |
| JEFFERSON HEALTH | : | |
| SYSTEM, INC., individually and d/b/a | : | |
| And | : | |
| JEFFERSON HEALTH | : | |
| Defendants | : | |

—————————————————————

## CIVIL ACTION COMPLAINT
## <u>DOCUMENT TO BE KEPT UNDER SEAL</u>
### (DO NOT PLACE ON PACER)

**DEREK SMITH LAW GROUP, PLLC**


BY: _____*/s/ Seth D. Carson*_____
        Seth D. Carson, Esq.
        1835 Market Street, Suite 2950
        Philadelphia, PA 19103
        Phone: 215.391.4790
        Email: seth@dereksmithlaw.com
        *Attorney for Plaintiff*

DATED: <u>December 3, 2020</u>

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

|  |  |  |
|---|---|---|
| | : | |
| UNITED STATES ex. rel. | : | JURY TRIAL DEMANDED |
| DR. ABRAHAM SCHEER | : | |
| | : | |
| Plaintiff | : | CIVIL ACTION NO. |
| v. | : | |
| | : | FILED IN CAMERA AND UNDER |
| BEEBE HEALTHCARE | : | SEAL PURSUANT TO 31 U.S.C. |
| | : | §3730(b)(2) |
| and | : | |
| BEEBE MEDICAL GROUP | : | |
| and | : | |
| JEFFERSON HEALTH | : | |
| SYSTEM, INC., individually and d/b/a | : | |
| And | : | |
| JEFFERSON HEALTH | : | |
| Defendants | : | |

_____:

**PLAINTIFF'S EX PARTE MOTION TO FILE THE BELOW
CIVIL ACTION COMPLAINT UNDER SEAL IN ACCORDANCE
WITH THE MANDATORY REQUIRMENTS OF THE FALSE CLAIMS ACT**

Pursuant to the mandatory requirements of the False Claims Act, 31 U.S.C. §

3730(b)(2), Plaintiff, Dr. Abraham Scheer, M.D., through his attorneys, Derek Smith Law

Group, PLLC, files this Ex Parte Motion to file the below Civil Action Complaint (and Civil

Cover Sheet) in this action under seal.

The Complaint in this qui tam action asserts violations of the False Claims Act

("FCA"), 31 U.S.C. §§ 3729 et seg. The FCA mandates that the Complaint be filed under

seal. 31 U.S.C. § 3730(b)(2). That section of the statute provides: "The complaint shall be

2

filed in camera, shall remain under seal for at least 60 days, and shall not be served on the

defendant until the court so orders." 31 U.S.C. § 3730(b)(2).

**DEREK SMITH LAW GROUP, PLLC**

BY: _____*/s/ Seth D. Carson*_____
           Seth D. Carson, Esq.
           1835 Market Street, Suite 2950
           Philadelphia, PA 19103
           Phone: 215.391.4790
           Email: seth@dereksmithlaw.com
           *Attorney for Plaintiff*

DATED: December 3, 2020

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---

|  |  |  |
|---|---|---|
| UNITED STATES ex. rel. | : | JURY TRIAL DEMANDED |
| DR. ABRAHAM SCHEER | : | |
| | : | |
| Plaintiff | : | CIVIL ACTION NO. |
| v. | : | |
| | : | FILED IN CAMERA AND UNDER |
| BEEBE HEALTHCARE | : | SEAL PURSUANT TO 31 U.S.C. |
| | : | §3730(b)(2) |
| and | : | |
| BEEBE MEDICAL GROUP | : | |
| and | : | |
| JEFFERSON HEALTH | : | |
| SYSTEM, INC., individually and d/b/a | : | |
| And | : | |
| JEFFERSON HEALTH | : | |
| Defendants | : | |

---

**CIVIL ACTION COMPLAINT**
**DOCUMENT TO BE KEPT UNDER SEAL**
**(DO NOT PLACE ON PACER)**

Plaintiff, Abraham, Scheer, M.D., by and through his attorneys, Derek Smith Law Group, PLLC, hereby files the following civil action complaint against Defendants, Beebe Healthcare, Beebe Medical Group, and Jefferson Health for violations of the False Claims Act, 31 U.S.C. §3729, and for retaliation under the False Claims Act, 31 U.S.C. §3730(h), for Defendants' false billing of Medicare and Medicaid, and Anti-Kickback Statute 42 U.S.C. § 1320a-7b(b), and the Physician Self-Referral Law 42 U.S.C. § 1395nn, and the laws of the Commonwealth of Pennsylvania and the State of Delaware and for retaliation against Plaintiff for having engaged in protected conduct, which ultimately led to Defendants' disciplining Plaintiff, withdrawing

Plaintiff's Medical Directorship, and terminating Plaintiff's employment.  Plaintiff hereby avers the following:

## **PARTIES**

1.      Plaintiff, Abraham Scheer, is an adult male individual who resides at 610 South Bay Shore Drive, Milton, Delaware and was employed from October 2010 to September 2020 by Defendant, Beebe Healthcare and Defendant, Beebe Medical Group as Director of Neurology/Stroke Services as well as a neuro-hospitalist (to care for both inpatients and outpatients).

2.      Defendant, BEEBE HEALTHCARE ("Beebe"), is an organization duly existing under the laws of the State of Delaware and was, at all times relevant, Plaintiff's employer.

3.      Defendant, Beebe Medical Group ("Beebe") is an organization duly existing under the laws of the State of Delaware and was, at all times relevant, Plaintiff's employer.

4.      Defendant, Jefferson Health is an organization duly existing under the laws of the Commonwealth of Pennsylvania and was at all times involves in a partnership with Defendant, Beebe Healthcare and Defendant, Beebe Medical Group to trade services for patients.

5.      At all times relevant to this civil action, Defendant Beebe Healthcare, Defendant, Beebe Medical Group (hereinafter "Beebe"), and Defendant, Jefferson Health were engaged in an unlawful conspiracy whereby Jefferson Health agreed to provide Beebe with tele-stroke services at Beebe's hospital located in Lewes, Delaware in in exchange for Beebe's agreement to transfer stroke patients to Jefferson Health in Philadelphia, Pennsylvania.

6.      At all times relevant to this civil action, Plaintiff, Abraham Scheer, M.D., was the Medical Director of Neurology / Stroke Services at Beebe's hospital in Lewes, Delaware and was

asked to take part in the unlawful transfer of patients from Beebe's hospital in Lewes Delaware to Jefferson Health in Philadelphia, Pennsylvania.

## JURISDICTION AND VENUE

7.      Subject matter jurisdiction is appropriate before this Court under Federal Question Jurisdiction, the False Claims Act, 31 U.S.C. §3729, and for retaliation under the False Claims Act, 31 U.S.C. §3730(h), for Defendants' false billing of Medicare and Medicaid, and Anti-Kickback Statute 42 U.S.C. § 1320a-7b(b), and the Physician Self-Referral Law 42 U.S.C. § 1395nn.

8.      Personal jurisdiction and venue are appropriate before this Court as Defendant, Jefferson Health, the organization that conceptualized the unlawful conspiracy and brought the conspiracy to market resides and/or reasonably avails itself of the Commonwealth of Pennsylvania in the City of Philadelphia, and all actions giving rise to this litigation could only have occurred once the patients were unlawfully transferred from Lewes Delaware to the Commonwealth of Pennsylvania.

## SUMMARY OF FACTS

9.      Sometime around August 2009, Plaintiff, Abraham Scheer, M.D., ("Dr. Scheer" or "Plaintiff")  began his employment for Defendant, Beebe Healthcare and Defendant, Beebe Medical Group ("Beebe" or "Defendants") through a medical staffing agency named Staff Care.

10.     Dr. Scheer was assigned to work by Staff Care at Beebe located at 424 Savannah Road, Lewes, DE 19958.  Dr. Scheer worked under the title Locum Tenens Neurologist.

11.     Sometime around October 2010, Dr. Scheer joined Beebe, as a Neuro-hospitalist and was contracted to treat both inpatients and outpatients at Beebe Hospital.

12.     Also sometime around October 2010, Dr. Scheer earned the title of Medical Director of Neurology/Stroke Services at Beebe.

13.     Dr. Scheer was employed by Beebe Medical Group as a Neuro-hospitalist and was contracted by the hospital to provide directorship in both neurology and stroke services.

14.     Plaintiff, Abraham Scheer provided services to Beebe Healthcare as both an independent contractor for Beebe Healthcare and as a w2 employee for Beebe Medical Group.

15.     From October 2010 until Dr. Scheer's unlawful termination from his employment, Dr. Scheer managed uninterrupted, neurology services for Beebe Healthcare and Beebe Medical Group earning awards and accolades along the way.

16.     Under Dr. Scheer's leadership, Beebe Healthcare and Beebe Medical Group earned a stellar reputation and became an accredited Advance Primary Stroke Center providing services for the community.

17.     Under Dr. Scheer's leadership, Beebe's stroke program received the highest level of recognition, and earned the title Gold Star Plus stroke program by the American Heart Association/American Stroke Association.

18.     Every year from 2011 until 2020, under Dr. Scheer's leadership, Beebe earned Gold Star recognition for its stroke program from the American Heart Association/American Stroke Association.

19.     Dr. Scheer joined Beebe Healthcare in 2009 with the goal of leading the hospital in an effort to attain stroke center certification.

20.     In 2010, Beebe went on to attain certification from the Joint Commission as an Advanced Primary Stroke Center.

21.     That certification means that Beebe provides a nationally recognized standard of care that fosters the best possible outcomes for stroke sufferers.

22.     Beebe Healthcare continues to be certified as an advanced primary stroke center.

23.     Beebe earned The Joint Commission's Gold Seal of Approval and the American Heart Association/American Stroke Association's Heart-Check mark for Advanced Certification for Primary Stroke Centers.

24.     The Gold Seal of Approval and the Heart-Check mark represent symbols of quality from their respective organizations.

25.     Dr. Scheer, brought to Beebe over thirty (30) years of clinical experience after training at the finest institutions in the United States including Columbia University College of Physicians and Surgeons, University of Connecticut, University of Pittsburgh, George Washington University and Georgetown University, and Cornell Medical College.

26.     Dr. Scheer is currently a diplomat of the American Board of Psychiatry and Neurology.  Dr. Scheer is also Board Certified in Adult Neurology with special qualifications in child neurology.  Dr. Scheer is Board Certified by the American Board of Psychiatry and Neurology/American Board of Physical Medicine and Rehabilitation in Brain Injury Medicine. Dr. Scheer currently holds active and unrestricted medical licenses in five (5) states; including Delaware and Pennsylvania.

27.     Dr. Scheer was recognized by Beebe after receiving an independent award for Top Doctor (Neurologist) in the State of Delaware in 2019 – less than a year before Dr. Scheer's unlawful termination from employment.

28.     Beebe Healthcare claims to operate with a mission "to encourage healthy living, prevent illness, and restore optimal health with the people residing, working, or visiting the communities we serve."

29.     Throughout his tenure with Beebe, Dr. Scheer discovered systemic violations of Medicare and Medicaid laws and significant deviation from the standard of care that Beebe claims to provide to the community and patients.

30.     Dr. Scheer noted these deficiencies sometime around 2010 when stroke patients seeking services in the State of Delaware were transferred to Jefferson Health in Philadelphia, Pennsylvania.

31.     By transferring stroke patients seeking medical services in the State of Delaware to Jefferson Health in Philadelphia, Pennsylvania, Beebe intentionally, and willfully disregarded Medicaid and Medicare laws requiring hospitals to transfer patients to the nearest appropriate facility.   Defendants willful and intentional violation of Medicare and Medicaid laws was done with knowledge and intent to defraud Medicare and Medicaid and numerous private health insurers by disregarding the requirement to transport patients to the nearest appropriate facility.  Defendants directed doctors to falsify medical records in order to avoid denial of payments/reimbursements from Medicare and Medicaid and numerous private health insurers.

32.     A stroke occurs when the blood supply to the brain is disrupted producing lack of oxygen (ischemia or hemorrhage).

33.     As an accredited Advanced Primary Stroke Center, Beebe provides medical care to stroke victims suffering from both hemorrhagic strokes as well as ischemic strokes.

34.     Hemorrhagic strokes and ischemic strokes represent the two primary ways that the blood supply to the brain may be disrupted.

35.    Hemorrhagic strokes make up about 13 percent of stroke cases and are caused by a weakened vessel that ruptures and bleeds into the surrounding brain. The blood accumulates and compresses the surrounding brain tissue.  Hemorrhagic strokes are often (but not always) the more serious type of stroke which can dramatically limit treatment options.

36.    An ischemic stroke is the most common type of stroke, occurring when a blood clot blocks the flow of blood and oxygen to the brain. These blood clots typically form in areas where the arteries have been narrowed or blocked over time by fatty deposits known as plaques.  There are more treatment options for patients suffering an ischemic strokes.

37.    The treatment options for ischemic strokes include but are not limited to tissue plasminogen activator ("tPA").  In certain cases patients may benefit from clot retrieval.

38.    Clot retrieval services requires a neuro-interventionalist.  Beebe offers tPA but has no neuro-interventionalist on site for clot retrieval for large vessel occlusions.

39.    There is a financial motivation for stroke specialists to treat patients suffering from ischemic strokes.  Ischemic strokes offer more treatment options with a better chance of survival.

40.    There is also a financial motivation for stroke specialists to avoid treatment of patients suffering from hemorrhagic strokes.  Often times the providers only option is to make the patient comfortable before he or she expires.

41.    For these reasons, Jefferson Health is reluctant to admit patients suffering from hemorrhagic strokes from certain hospitals including but not limited to Beebe.

42.    Jefferson's reluctance to accept patients suffering from hemorrhagic strokes is based on organizational policies, procedures and protocols where by Jefferson Health trains partnering hospitals to only send patients that provide Jefferson a financial advantage, i.e., patients suffering from ischemic strokes.

10

43.     Jefferson's clinical outcomes from 2017 to 2018 reflect its policy to avoid patients suffering from hemorrhagic strokes.  Because of Jefferson's policies, procedures and protocols to focus on patients suffering from ischemic strokes and to avoid patients suffering from hemorrhagic strokes, the number of patients treated at Jefferson suffering from hemorrhagic strokes decreased from 2017 to 2018 while the number of patients treated at Jefferson suffering from ischemic strokes increased during the same period.

44.     Jefferson partnered with Beebe sometime around 2010, when Jefferson directed Beebe to transfer patients suffering from ischemic strokes from Lewes, Delaware to Philadelphia, Pennsylvania.

45.     Importantly, Jefferson Health, located in Philadelphia, Pennsylvania is 125 miles from Beebe Hospital in Lewes, Delaware.

46.     There are at least ten (10) hospitals that offer the same or more comprehensive services within a closer distance from Defendant, Beebe to Defendant, Jefferson Health for patients suffering from stroke.

47.     Accordingly, in order to transfer a patient suffering from stroke from Beebe in Lewes Delaware to Jefferson Health in Philadelphia, Pennsylvania, Beebe and Jefferson must disregard at least ten (10) closer hospitals along with Medicaid and Medicare laws that require transfer of patients to the nearest appropriate facility.

48.     Accordingly, Jefferson Health and Beebe are engaged in a conspiracy to commit Medicare and Medicaid fraud by disregarding Medicare and Medicaid laws that require patients suffering from stroke to be transferred to the nearest possible facility.

49.     Plaintiff, Abraham Scheer reported the Medicare and Medicaid fraud to the Vice President of Medical Affairs, Dr. Jeffrey Hawtof who disregarded Plaintiff's reports.

50.     Dr. Hawtof acknowledged the Medicare and Medicaid fraud, however, from the time the conspiracy began to the present, Beebe and Jefferson Health have refused to take any steps to ameliorate the fraud.  In fact, the number of patients suffering from stroke that are unlawfully transferred from Beebe to Jefferson has only increased.

51.     From 2010 and continuing though the present, Beebe and Jefferson Health have engaged in a criminal conspiracy to defraud the Medicare and Medicaid system, along with countless other private health insurance companies by falsifying medical records and setting up a system whereby patients suffering from stroke are transferred from Beebe to Jefferson, bypassing at least five comprehensive stroke centers that offer the same treatment as Jefferson Health but are closer to Beebe.

52.     In the world of stroke there is a guiding principle that time is brain.  Accordingly, Jefferson and Beebe's conspiracy to defraud Medicaid and Medicare also disregard's patient care in order to facilitate a quid pro quo arrangement that weighs revenues over patient care.

53.     By way of example, when a patient suffering from an ischemic stroke is unlawfully transferred from Beebe to Jefferson Health, it often requires a helicopter transport directly from Beebe to Jefferson.  Importantly, Bay Health, in Delaware, has stroke services (neuro-interventionalists and neurosurgery) and is only twenty-two (22) miles from Beebe.  Christiana Hospital, in Delaware,  is a comprehensive stroke center and is only eighty (80) miles from Beebe. Accordingly, Medicaid and Medicare, along with countless private health insurers, are reimbursing patients for helicopter transports when an ambulance should have transported the patients to a closer stroke center in accordance with the black letter Medicaid and Medicare requirements.

54.     The cost to transport patients from Beebe to Jefferson Health is just one of many increased costs associated with the Medicaid and Medicare fraud related to a refusal to consider the closer comprehensive stroke center.

55.     When patients suffering from stroke are transported from Beebe to Jefferson Health by helicopter, it requires a higher level of expertise among the transport crew.  The cost that patients are required to pay for this higher level of expertise is also billed through Medicaid, Medicare, or some other private health insurer.

56.     Patients arriving at Jefferson are then unnecessarily and unlawfully billed through Jefferson's medical billing program for Jefferson's comprehensive stroke center.   Many of these patients are automatically admitted to Jefferson Health due to the unlawful conspiracy that exists between Beebe and Jefferson, which is a quid pro quo arrangement where Jefferson trades "free tele-stroke services and free tele-neurology services" as long as Beebe agrees to refer all of these patients to Jefferson.

57.     Accordingly, the cost of care for patients transferred from Beebe to Jefferson, which is the costs unlawfully bills to Medicare and Medicaid, along with countless private health insurers, increases exponentially compared to the cost the patients would pay but for the unlawful conspiracy.

58.     Treating physicians who work at Beebe often discuss the unfair way in which this unlawful conspiracy affects patient outcomes which weighs profits and revenues over patient care.

59.     On August 11, 2020 Jeannie Wallo, who is the Patient Experience Director for Beebe sent an email to Mary Frances Suter, DNP, AG-ACNP, GNP-BC, AACC, NEA-BC, who is the Executive Director of Cardiac & Vascular Services.  Jennie Wallo's August 11, 2020 email was sent in connection with treatment rendered to Beebe Patient, SO.  Patient SO suffered from a

Transient Ischemic Attack ("TIA") sometime around May 26, 2020.  Patient SO was automatically transferred from Beebe to Jefferson Health pursuant to the Hospitals' unlawful conspiracy to defraud patients and health care insurers by disregarding closer hospitals that could offer comparable treatment through a stroke center.  Beebe Hospital unlawfully disregarded at least five closer stroke centers by automatically transferring Patient, SO from Beebe to Jefferson.  This transfer was made at the risk to Patient SO's health and safety in the interest of the quid pro quo arrangement between Beebe and Jefferson.  Patient, SO's private health insurance provider denied approximately $29,000 in costs billed in connection with the unlawful transfer from Beebe to Jefferson.  The August 11, 2020 email from Jeanie Wallo presented several questions to Mary Frances Suter including: "Why don't we have neurology coverage at Beebe?  Was someone on vacation?  Why did we send SO to Jefferson?  She knows that they do good work there but why did we send him further away then necessary, past Christiana and much further than  PMRC? Mary Francis Suter's response email acknowledged the wrongful decision to send the patient directly from Beebe to Jefferson, however, Mary Francis Suter's response refused to acknowledge that she was complicit in the unlawful conspiracy by requiring Beebe physicians to transfer patients suffering from stroke directly to Jefferson as policy.  The Medical Director of the Emergency Room at Beebe Hospital, who is also the State of Delaware Medical Director for Emergency Medical Services, Dr. Kevin Bristowe, M.D., sent a scathing response to Beebe Administration, illuminating the unlawful conspiracy.  On August 11, 2020, Dr. Bristowe wrote, "… My providers have been told to use the Jefferson robot and refer our strokes to Jefferson."  Dr. Bristowe's email confirms Beebe's quid pro quo arrangement whereby ALL stroke patients were unlawfully transferred from Beebe to Jefferson without any consideration for closer comprehensive stroke centers.  Dr. Bristowe also wrote, "… we have an agreement with Jefferson

and they will take all our stroke patients.   So hence, the patient gets the care he needs.  Strong

work ED team  for following the process and getting the patient the care he needs!"  Dr. Bristowe's

email clearly confirms that Beebe policy is to send all stroke patients, no matter what the rationale,

to Jefferson Health, without consideration for Medicaid or Medicare laws and requirements.

60.     Another email sent June 5, 2020 by Dr. Kristie Zangari, M.D., who is the Vice

Chairman of the Department of Medicine also confirms the unlawful conspiracy was actually

Beebe Policy to send all neurology patients suffering from Ischemic strokes to Jefferson Health.

Dr. Zangari's email was specifically sent to notify all Beebe hospitalists of Beebe's policy to send

stroke patients to Jefferson.  Dr. Zangari wrote, "… for all CVA's that present to the ER, with a

wake up stroke or new symptoms of stroke less than 24 hours, with ***automatic admission to Jeff***."

Dr. Zangari also wrote, "Same process as in patient with ***similar automatic transfer to Jeff*** if

necessary."

61.     The unlawful conspiracy referenced by Mary Francis Suter, Dr. Zangari, and Dr.

Bristow began sometime around 2011 when Dr. Scheer and Dr. Hawtof discussed the unlawful

implications associated with the automatic transfer of stroke patients to Jefferson through the

Jefferson physicians.

62.     In 2011, Jefferson attempted to replace Beebe Hospital's neuro-hospitalists with a

Jefferson robot called "Jet-Stat."   Dr. Scheer, the then Director of Neurology / Stroke Services

opposed the Jet-Stat robot due to the implications of allowing Jefferson to transfer Beebe's patients

out of state without regard to Medicaid and Medicare laws, and the contractual obligations of

private health insurance holders.

63.     Due to Plaintiff, Abraham Scheer's opposition to the automatics transfer of stroke

patients from Beebe to Jefferson Health, Dr. Scheer was cut out from meetings between Beebe and

15

Jefferson Health where the unlawful conspiracy to defraud Medicaid and Medicare was agreed upon.

64.     In March 2019, Mr. Jeffrey Fried, who was the past CEO of Beebe, ended his employment with Beebe Healthcare.

65.     It was around this same time when Beebe and Jefferson Health agreed to a quid pro quo arrangement where all Beebe stroke patients would be automatically transferred from Beebe to Jefferson notwithstanding Medicaid and Medicare laws and requirements governing the transfer of patients to the closest geographical facility.

66.     Jefferson Health's conspiracy to defraud Medicaid and Medicare, along with numerous private healthcare providers was entered into in violation of the False Claims Act 31 U.S.C. § § 3729-3733, and Anti-Kickback Statute 42 U.S.C. § 1320a-7b(b), the Physician Self-Referral Law 42 U.S.C. § 1395nn, and the laws of the Commonwealth of Pennsylvania and the State of Delaware.

67.     Jefferson has conspired to systemically defraud Medicaid and Medicare, along with numerous private health insurance providers, by marketing its tele-stroke program to numerous hospitals including but not limited to Beebe.  Hospitals to which Jefferson has marketed its neuro-stroke program include: Abington Hospital – Jefferson Health - Abington, PA Abington-Lansdale Hospital – Jefferson Health - Lansdale, PA, Berwick Hospital Center (Commonwealth Health) - Foundryville, PA, Brandywine Hospital - Coatesville, PA, Bryn Mawr Hospital (Main Line Health) - Bryn Mawr, PA, Chestnut Hill Hospital - Philadelphia, PA, Doylestown Hospital - Doylestown, PA, Jefferson Bucks Hospital - Langhorne, PA, Jefferson Frankford Hospital - Philadelphia, PA, Jefferson Health Mobile Stroke Unit - Bensalem, PA, Jefferson Methodist Hospital (Thomas Jefferson University Hospitals) - Philadelphia, PA, Jefferson Torresdale

Hospital - Philadelphia, PA, Jennersville Regional Hospital - West Grove, PA, Lankenau Medical Center (Main Line Health) - Wynnewood, PA, Mercy Fitzgerald Hospital (Mercy Health System) - Darby, PA, Mercy Philadelphia Hospital (Mercy Health System) - Philadelphia, PA, Moses Taylor Hospital (Commonwealth Health) - Scranton, PA, Nazareth Hospital (Mercy Health System) - Philadelphia, PA, Paoli Hospital (Main Line Health) - Paoli, PA, Phoenixville Hospital - Phoenixville, PA, Pottstown Memorial Medical Center - Pottstown, PA, Regional Hospital of Scranton (Commonwealth Health) - Scranton, PA, Riddle Hospital (Main Line Health) - Media, PA, Tyler Memorial Hospital (Commonwealth Health) - Meshoppen, PA, Wilkes-Barre General Hospital (Commonwealth Health) - Wilkes-Barre, PA, AtlantiCare Health Park at Hammonton - Hammonton, NJ, AtlantiCare Regional Medical Center City Campus - Atlantic City, NJ, AtlantiCare Regional Medical Center Mainland Campus - Galloway, NJ, Jefferson Cherry Hill Hospital - Cherry Hill, NJ, Jefferson Stratford Hospital - Stratford, NJ, Jefferson Washington Township Hospital - Turnersville, NJ, Shore Medical Center - Somers Point, NJ.

68.     Anytime a hospital transfers stroke patients to Jefferson without regard to Medicare and Medicaid laws that require the transfer of stroke patients to the nearest comprehensive stroke center, it constitutes a violation of False Claims Act 31 U.S.C. § § 3729-3733, and Anti-Kickback Statute 42 U.S.C. § 1320a-7b(b), the Physician Self-Referral Law 42 U.S.C. § 1395nn.

69.     Jefferson is partnering with these hospitals, including but not limited to Beebe, and then taking advantage of the partnership by unlawfully referring patients from one member of the partnership to another.  To facilitate these unlawful referrals, Jefferson must disregard black-law Medicare and Medicaid requirements.

70.     Beebe administration including but not limited to Dr. Bobby Gulab, who is the Senior Vice President and Chief Medical Officer of Beebe Medical Group, informed Plaintiff,

Abraham Scheer that Beebe Medical Group lost twenty-seven-million-dollars ($27,000,000) in 2019. During the same conversation, Dr. Gulab acknowledged that the criminal conspiracy with Jefferson Health was one of Beebe Medical Group's plans for recouping the lost revenue.

71.     The objective of the criminal conspiracy between Beebe Healthcare, Beebe Medical Group, and Jefferson Health is to dismantle and scuttle the neuro-hospitalist program.

72.     Prior to the unlawful conspiracy between Jefferson and Beebe, the neuro-hospitalist program cost Beebe Medical Group at least a million dollars ($1,000,000) annually. Accordingly, Jefferson Health's quid pro quo agreement with Beebe to trade free services for automatic referral of all Medicaid and Medicare patients is a direct violation of the Anti-Kickback Statute 42 U.S.C. § 1320a-7b(b). That is, Jefferson Health is trading free services that are worth the cost of Beebe's neuro-hospitalist program in exchange for the automatic referral of all stroke patients suffering from ischemic strokes.

73.     The unlawful, criminal conspiracy between Beebe and Jefferson led to the natural, inevitable outcome. That is, Beebe Medical Group and Beebe Healthcare terminated the neuro-hospitalist program entirely sometime around September 4, 2020.

74.     September 4, 2020, Plaintiff, Abraham Scheer, M.D. was unlawfully terminated from his employment in violation of the False Claims Act 31 U.S.C. § § 3729-3733, and Anti-Kickback Statute 42 U.S.C. § 1320a-7b(b), the Physician Self-Referral Law 42 U.S.C. § 1395nn, and the laws of the Commonwealth of Pennsylvania and the State of Delaware.

75.     Plaintiff, Abraham Scheer, M.D. repeatedly reported Defendants violations of State, Commonwealth, and Federal laws including violations of Medicaid and Medicare laws.

76.    At all times, Defendants refused to consider Plaintiff's reports of unlawful conduct which constituted a whistle-blowing  where Plaintiff notified Defendants that Defendants were in violation of the laws of the State of Delaware and Federal laws including the False Claims Act.

77.    Sometime around November 5, 2019, Cary Rutherford, who is the Transfer Care Coordinator for Beebe Healthcare sent an email to several Directors.  Plaintiff, Abraham Scheer, M.D. who was the Director of Neurology / Stroke Services at that time received a copy of the email.  The email provided Beebe employees with instructions for how to falsify medical records in order to confirm that Medicaid, Medicare, and numerous private health insurance providers did not deny payment for services due to violations of Medicaid and Medicare laws.   The email read:

> Insurance companies started denying transfer's to Jefferson Hospital including strokes because Christiana Hospital  is 59 miles closer than Jefferson.  Insurance companies will not pay the difference in miles.  Here is how I can attempt to get these claims paid for when I write appeal letters
>
> 1.    Physicians must document in the chart they have tried to call Christiana Hospital.
> 2.    If Christiana is full or at capacity then I can write that in the appeal letter must be documented in the chart.  95 percent of time my appeal letters are overturned and the bills paid
> 3.    Neurologist should really always call Christiana first. There should never be a delay getting these patient to the INR suite at CCHS.
>
> Let me know if you have any questions and please share with your providers

78.    This email is one of many examples where Jefferson and Beebe discussed, planned, conspired, and coordinates how to defraud Medicaid and Medicare through the falsification of medical records.

79.    Plaintiff, Abraham Scheer, M.D. was approached by a Jefferson liaison on many occasions who assured Dr. Scheer that Jefferson would assist Beebe with strategies to avoid, evade,

and bypass Medicaid and Medicare laws requiring the transfer of stroke patients to the nearest comprehensive stroke center.

80.     From 2011 until the present, Jefferson Health aggressively marketed its tele-stroke services to Beebe.  Plaintiff, Abraham Scheer, M.D. consistently presented Jefferson Health with reasons why the automatic referral of every stroke patient from Beebe to Jefferson was an unsustainable option.  Plaintiff, Abraham Scheer, M.D. explained that patient safety and patient care was paramount.  Plaintiff, Abraham Scheer, M.D. explained that inclement weather would prevent the helicopter transports from flying and Beebe Hospital was too far away to transport stroke patients who required immediate care.

81.     Jefferson continued to aggressively market its tele-stroke product without any regard for Plaintiff, Abraham Scheer, M.D.'s concerns for patient care and patient safety.

82.     In fact Plaintiff, Abraham Scheer, M.D. was systematically and intentionally excluded from emails concerning stroke patients.  Defendants decision to exclude Plaintiff, Abraham Scheer, M.D., from emails concerning stroke patients was highly concerning as Plaintiff was the Director of Neurology / Stroke Services at Beebe and therefore the primary person at Beebe who should have been included in emails related to Beebe policy for stroke patients.

83.     Defendants decision to exclude Plaintiff from decisions concerning stroke patients was due to Plaintiff's persistent reports that Beebe was engaged in unlawful conduct.

84.     Defendants informed Plaintiff that Dr. Scheer "you can either be the problem or part of the solution."

85.     Jefferson circumvented Plaintiff, Abraham Scheer, M.D., so that Dr. Scheer was no longer invited to meetings to discuss the future of Beebe's neurology program and Beebe's policy for automatic referral of Beebe stroke patients to Jefferson.   In an effort to continue the quid pro

quo conspiracy, Dr. Scheer's efforts to maintain standards for credentialing Jefferson physicians was circumvented and ignored.

86.     Beebe ignored its own credentialing policies to qualify the Jefferson physicians.

87.     Jefferson Health's policy is to assist community and hospital neurologists to care for their stroke patients.

88.     Defendant, Jefferson is violating its own policy solely to increase revenues and is setting up its first free tele-NEUROLOGY program at Beebe.

89.     Accordingly, Beebe is a test case for expanding Jefferson's unlawful tele-stroke product to include tele-neurology.

90.     Jefferson's unlawful conspiracy to defraud Medicare and Medicaid is not relegated to Beebe.  Jefferson has brought to market a product that can only work if hospitals engage in the unlawful conspiracy to defraud Medicare, Medicaid and numerous private health insurers.

91.     Defendant, Jefferson's product is aimed toward increasing its market share for stroke services.

92.     The Center for Disease Control calculates that Stroke-related costs in the United States came to nearly $46 billion between 2014 and 2015.  This total includes the cost of health care services, medicines to treat stroke, and missed days of work.

93.     KHN, the nation's leading and largest health and health policy newsroom projects that the government now pays for nearly 50 percent of health care spending, an increase driven by baby boomers shifting into Medicare.

94.     Accordingly stroke services represents a multi-billion dollar market for Medicaid and Medicare patients in the Northeast region of the United States.

95.     Jefferson's tele-stroke product line is aimed toward substantially increasing its market share for stroke services in Pennsylvania, New Jersey, and Delaware.

96.     Jefferson's tele-stroke product line cannot exist without the acceptance and willful, intentional strategy to commit Medicaid and Medicare fraud.

97.     By its very definition, Jefferson's tele-stroke product line is aimed toward achieving Medicaid and Medicare fraud.

98.     Jefferson approaches hospitals including Beebe and offers free tele-stroke services with a tele-stroke robot called a Jet-Stat."

99.     The deal offered by Defendant, Jefferson is free tele-stroke services in exchange for all ischemic stroke patient transfers.  This is the quid pro quo arrangement.

100.     However, hospitals, including Defendant, Beebe cannot agree to providing Jefferson all ischemic stroke transfers because Beebe does not have any choice in where patients are transferred.  Medicare and Medicaid laws require patients to be transferred to the nearest appropriate facility.

101.     Accordingly, Jefferson's "free" tele-stroke service is only a viable product if hospitals willfully engage in Medicaid and Medicare fraud to guarantee that ischemic stroke patients are transferred to Jefferson in Philadelphia, Pennsylvania.

102.     If hospitals like Beebe do not engage in Medicaid and Medicare fraud, Jefferson's tele-stroke product line will only increase Jefferson's costs with no benefitting revenues and profits.  This is because there are numerous closer facilities where patients must be transferred if hospitals follow the Medicaid and Medicare laws.  Jefferson would never receive a stroke patients transfer as there is almost always a closer viable option.

103.     Accordingly, when Jefferson marketed its stroke product line to Beebe, Jefferson assured Beebe that they would assist Beebe in avoiding, circumventing, and defrauding Medicaid and Medicare.  Jefferson sent Beebe email notifications that if Beebe ran into issues with billing, to contact Jefferson who would assist Beebe in assuring the bills were covered.

104.     Jefferson engaging in billing issues for Beebe patients is part of the quid pro quo conspiracy agreement to guarantee that Jefferson receives its end of the deal in exchange for providing free tele-stroke services to Beebe.

105.     Today, Jefferson and Beebe are in the process of enlarging the agreement/conspiracy to include not just tele-stroke patients but to also include tele-neurology patients.

106.     The same illegal paradigm exists for tele-neurology patients.  Jefferson

107.     Jefferson's tele-neurology product line can only exist if hospitals including Beebe agree to engage in criminal conduct to defraud Medicaid and Medicare.

108.     Plaintiff, Abraham Scheer, M.D. worked to deny Jefferson and Beebe from continuing the illegal billing scheme and was terminated from his employment.

109.     Medicaid and Medicare laws that require patients to be transferred to the nearest appropriate facility is am important law aimed to minimizing the cost of healthcare for the United States tax payors.

110.     In order for Medicaid and Medicare to remain solvent, so that United States citizens are able to benefit from these social services, medical providers must act in accordance for the public good.

111.     If medical providers and patients were permitted to choose any healthcare provider for stroke services, every patient would request a transfer to Harvard, Yale, UCLA, or some other

top tier medical provider.  If this were permitted, the cost of healthcare for stroke services would sky-rocket as Medicaid and Medicare would be required to pay for the increased costs to transport patients to these facilities which includes Jefferson Health.

112.    To avoid this outcome and maintain the viability of the entire government healthcare system, the United States government has enacted Medicaid and Medicare laws and regulations.  These regulations are crucial to maintain the viability of the government healthcare system.

113.    Defendant, Jefferson Health has brought to market a product designed to circumvent, avoid, and disregard these laws with the sole objective of increasing Jefferson market share for stroke and neurology patients.

114.    Jefferson Health, located in Philadelphia, Pennsylvania is the hub of a large franchise-like partnership with over fifty (50) hospitals in New Jersey, Pennsylvania, and Delaware.  This includes Beebe.

115.    Jefferson Hospital's stroke and neurology product line is designed to provide these partnering hospitals with "free" tele-stroke and tele-neurology services.  Only the product is not really free.  In exchange for offering this so-called free service, the Jefferson robot called the Jet-Stat, Jefferson requires hospitals to transfer stroke and neurology patients to Jefferson without regard for the Medicaid and Medicare laws.

116.    If hospitals including Beebe have problems with the Medicaid and Medicare bills, Jefferson teaches, assists, trains Beebe how best to make certain that bills are covered.  This includes the falsification of medical records to report that Beebe attempted to contact a closer facility and was unable to do so.  This includes Beebe doctors charting that they attempted to

contact a closer facility but the beds were full.  This also includes Jefferson actually getting involved to directly assist Beebe with Beebe's billing issues.

117.    If Jefferson is permitted to continue its unlawful conduct, there is no limit to the cost/burden to taxpayers and to the entire government healthcare system.

118.    Jefferson is in the process of expanding its product line to include other tele-services based on the same illegal quid pro quo agreement to transfer patients to Jefferson. Jefferson is attempting to expand the program past tele-stroke to tele-neurology.

119.    Upon information and believe Jefferson is also attempting to expand the program to other areas of medicine as well.

**COUNT ONE**
**FALSE CLAIMS ACT**
*31 U.S.C. §3729*
**(PLAINTIFF V. DEFENDANTS)**

120.    Plaintiff incorporates the foregoing paragraphs as if set forth at length herein.

121.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, et seq., as amended.

122.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the United States Government for payment or approval.

123.    By virtue of the acts described above Defendant knowingly made or used, or caused to be made or used, false or fraudulent records or statements material to false or fraudulent claims for payment by the Government.

124.    Plaintiff cannot at this time identify all of the false claims for payment that were caused by Defendant's conduct. The false claims were presented by several separate entities.

125.    Plaintiff does not have access to the records of all such false or fraudulent statements, records or claims.

126.    Plaintiff has reviewed records that indicate Defendants intentional fraudulent conduct in submitting fraudulent claims and creating fraudulent records in the conspiracy to increase market share for stroke services for Defendant, Jefferson Health.

127.    The Government, unaware of the falsity of the records, statements and claims made or caused to be made by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's illegal conduct.

128.    By reason of Defendant's acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

129.    Additionally, the United States is entitled to the maximum penalty of up to $11,000 for each and every violation arising from Defendant's unlawful conduct alleged herein.

130.    The federal False Claims Act provides in pertinent part:

a.    *Any person who (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; (3) conspires to defraud the Government by getting a false claim allowed or paid, is liable to the United States Government for a civil penalty of not less than $5,500 and not more than $11,000, plus 3 times the amount of damages which the Government sustains because of the act of that person.*

b.    *For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent or defraud is required.*

26

*See* 31 U.S.C. §3729 (a) & (b).

131.    The *prima facie* elements to a False Claims Act claim require that (1) the defendant presented or caused to be presented to an agent of the United States a claim for payment, (2) the claim was false or fraudulent, and (3) the defendant knew the claim was false or fraudulent.

132.    Defendant violated the Federal False Claims Act by knowingly and intentionally making false claims to Medicare and Medicaid for payment, including claims for stroke services including but not limited to  transportation services by helicopter, hospital stays, and medical treatment for patients suffering from stroke.

133.    Defendants, by and through staff engaged in a conspiracy to increase market share for stroke services at Jefferson Health by defrauding Medicare and Medicaid through submitting false claims and falsifying medical records.   This fraudulent scheme began as early as 2011 and continues to the present.

134.    Defendants are in the process of increasing the fraudulent conduct by expanding the conspiracy to include other services including but not limited to tele-neurology.

135.    As a direct and proximate result of Defendants' conduct, Defendants defrauded the United States Government and citizens and caused the government economic loss.

136.    Plaintiff brings this action to recover up to 30% of the funds to be recovered by the government.

137.    Defendants specifically entered into an agreement where Jefferson agreed to partner with Beebe and provide stroke consultations to Beebe Hospital if Beebe agreed to refer stroke patients to Jefferson.

138.    Importantly Defendants must disregard Medicaid and Medicare laws in order to affirm the partnership as Defendants are not able to choose where stroke patients are referred.

27

139.    Medicare and Medicaid laws require that patient referrals from one hospital to another must be referred to the nearest appropriate facility.

140.    These laws requiring patients to be referred to the nearest appropriate facility are crucial to maintaining the cost of healthcare services for the United States tax payer.

141.    If hospitals and/or patients were permitted to choose the facility to where they were referred, the cost of healthcare would skyrocket and social programs like Medicare and Medicaid would no longer be viable.

142.    The United States Healthcare system relies on healthcare providers like Jefferson and Beebe to act in accordance with Medicare and Medicaid laws.

143.    Defendants chose to enter into a quid pro quo fraudulent agreement whereby Jefferson assisted Beebe and other hospitals in creating false medical records to circumvent, avoid and disregard Medicare and Medicaid laws in order to increase Jefferson's market share for stroke services.

144.    Because of the quid pro quo fraudulent agreement Jefferson is today able to market stroke services to a large geographic area that encompassing Pennsylvania, New Jersey, and Delaware.

150.    Defendants are in the process of vertical and horizonal marketing to enlarge this fraudulent program to increase market share for stroke services to include a larger geographical area and to include other services other than stroke.  By way of example, Defendants are seeking to enlarge the program to also include neurology.

**WHEREFORE,** Plaintiff, Dr. Abraham Scheer, M.D., demands all relief and damages from Defendants, Beebe Healthcare, Beebe Medical Group, and Jefferson Health, recoverable

under law and as deemed reasonable and just by the Court.  This includes but is not limited to judgment against the Defendants as follows:

a)  That Defendants cease and desist from violating 31 U.S.C. § 3729 et seq.

b)  That this Court enter judgment against Defendant in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

c)  That Plaintiff be awarded the maximum amount allowed pursuant to § 3730(d) of the False Claims Act.

d)  That Plaintiff be awarded all costs of this action, including attorneys' fees and expenses; and,

e)  That Plaintiff recover such other relief as the Court deems just and proper.

### COUNT TWO
### RETALIATION
### *FALSE CLAIMS ACT, 31 U.S.C. §3730(H)*
### (PLAINTIFF V. DEFENDANTS)

151.  Plaintiff incorporates the foregoing paragraphs as if set forth at length herein.

152.  The federal False Claims Act anti-retaliation provision provides in pertinent part:

*h.      (1) In general.--Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or*

*associated others in furtherance of an action under this section or other efforts to
stop 1 or more violations of this subchapter…*

*See* 37 U.S.C.A. §3730 (h).

153.   Plaintiff engaged protected activity when he made internal complaints to
Defendants and when he made complaints about the fraudulent billing practices in furtherance of
an action under the False Claims Act.

154.   Defendants were aware of Plaintiff's protected conduct and thus were aware of the
distinct possibility of False Claims Act litigation.

155.   Specifically, Plaintiff's numerous internal conversations opposing the billing
practices, and Defendants practices to create false medical records in furtherance of the fraudulent
billing practices indicate that Defendants were on notice and/or reasonable notice of Plaintiff's
protected conduct.

156.   Defendants retaliated against Plaintiff by unlawfully terminating Plaintiff's
employment.

157.   Defendants also withdrew Plaintiff's access to the hospital.

158.   Defendant, Beebe Medical Group and Beebe Healthcare both simultaneously
terminated Plaintiff's employment as Beebe Hospital's Medical Director for Stroke and
Neurology.  Defendants also terminated Plaintiff's employment as a neuro-hospitalist.

159.   Defendants terminated Plaintiff's employment due to Plaintiff engaging in
protected activity and reporting and opposing Defendants' ongoing illegal conduct to defraud
Medicare and Medicaid by submitted false bills for payment and by creating false medical records
in order to make sure that fraudulent bills were paid.

160.     Defendant's materially adverse actions of discharging Plaintiff (terminating) were temporally proximate to Plaintiff's protected activity such that it/they are usually suggestive of retaliation.

161.     Furthermore, there is clear evidence of retaliatory animus in Defendant's actions to support that Defendant's conduct were supported and motivated by retaliation for Plaintiff's above referenced protected conduct.

162.     As a direct and proximate result of Defendant's retaliation, Plaintiff has loss of wages, loss of benefits, loss of 401K, out-of-pocket expenses, pain and suffering, emotional damages and harms, loss of reputation, loss of enjoyment of life.

163.     Plaintiff seeks all damages recoverable including double (2x) his backpay damages, interest on his backpay damages, costs of litigation, and reasonable attorney's fees.

**WHEREFORE,** Plaintiff, Dr. Abraham Scheer, M.D., demands all relief and damages from Defendants, Beebe Healthcare, Beebe Medical Group, and Jefferson Health, recoverable under law and as deemed reasonable and just by the Court including but not limited to compensatory damages, punitive damages attorney's fees, back pay, front pay, liquidated damages, and emotional distress.  This also includes but is not limited to judgment against the Defendants as follows:

a)   That Defendants cease and desist from violating 31 U.S.C. § 3729 et seq.

b)   That this Court enter judgment against Defendant in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

c) That Plaintiff be awarded the maximum amount allowed pursuant to§ 3730(d) of the False Claims Act.

d) That Plaintiff be awarded all costs of this action, including attorneys' fees and expenses; and,

e) That Plaintiff recover such other relief as the Court deems just and proper.

**COUNT THREE**
**_ANTI-KICKBACK STATUTE [42 U.S.C. § 1320A-7B(B)]_**
**(PLAINTIFF V. DEFENDANTS)**

164.   Plaintiff incorporates the foregoing paragraphs as if set forth at length herein.

165.   The Anti-Kickback Statute prohibits the knowing and willful payment of "remuneration" to induce or reward patient referrals or the generation of business involving any item or service payable by the Federal health care programs (e.g., drugs, supplies, or health care services for Medicare or Medicaid patients).

166.   Remuneration includes anything of value and can take many forms besides cash, such as free rent, expensive hotel stays and meals, and excessive compensation for medical directorships or consultancies.

167.   In the Federal health care programs, paying for referrals is a crime.

168.   The statute covers the payers of kickbacks-those who offer or pay remuneration- as well as the recipients of kickbacks-those who solicit or receive remuneration.

169.   Defendants knowingly and willfully intended to enter and entered into a quid pro quo arrangement between Beeb and Jefferson.  Jefferson agreed to provide Beebe with free stroke consultations through a "tele-stroke robot" and Beebe agreed to refer all stroke patients where there was a significant opportunity for billing to Jefferson through Jefferson's private helicopter service.

170.     In order to enter into this agreement both Beebe and Jefferson had to intentionally disregard patient care and patient safety.

171.     Criminal penalties and administrative sanctions for violating the Anti-Kickback Statute include fines, jail terms, and exclusion from participation in the Federal health care programs.

172.     Defendants paid and/or accepted kickbacks in a trade which was stroke patient for free stroke services.  To facilitate this quid pro quo arrangement Defendants had to disregard Medicare and Medicaid laws that require patients to be transferred to the nearest appropriate facility.

173.     The quid pro quo arrangement between Jefferson and hospitals that are part of Jefferson's quid pro quo agreement unnecessarily and unlawfully increase the cost of healthcare by violating Medicare and Medicaid laws.

174.     The Anti-Kickback Statute (42 U.S.C. § 1320a-7a(a)(5)) imposes civil monetary penalties on physicians who offer remuneration to Medicare and Medicaid beneficiaries to influence them to use their services.

**WHEREFORE,** Plaintiff, Dr. Abraham Scheer, M.D., demands all relief and damages from Defendants, Beebe Healthcare, Beebe Medical Group, and Jefferson Health, recoverable under law and as deemed reasonable and just by the Court.  This includes but is not limited to judgment against the Defendants as follows:

   a)      That Defendants cease and desist from violating 31 U.S.C. § 3729 et seq.

   b)      That this Court enter judgment against Defendant in an amount equal to three times the amount of damages the United States has sustained because of

Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

c)     That Plaintiff be awarded the maximum amount allowed pursuant to § 3730(d) of the False Claims Act.

d)     That Plaintiff be awarded all costs of this action, including attorneys' fees and expenses; and,

e)     That Plaintiff recover such other relief as the Court deems just and proper.

## COUNT FOUR
### *PHYSICIAN SELF-REFERRAL LAW [42 U.S.C. § 1395NN]*
### (PLAINTIFF V. DEFENDANTS)

175.    Plaintiff incorporates the foregoing paragraphs as if set forth at length herein.

176.    The Physician Self-Referral Law, commonly referred to as the Stark law, prohibits physicians from referring patients to receive "designated health services" payable by Medicare or Medicaid from entities with which the physician or an immediate family member has a financial relationship.

177.    Financial relationships include both ownership/investment interests and compensation arrangements.

178.    Defendants intended to violate and violate the Stark laws by entering into a partnership between Beebe Medical Group, Beebe Healthcare and Jefferson.

179.    The Stark law prohibits the submission, or causing the submission, of claims in violation of the law's restrictions on referrals.

180.    Penalties for physicians who violate the Stark law include fines as well as exclusion from participation in the Federal health care programs.

34

181.    Defendants specifically entered into an agreement where Jefferson agreed to partner with Beebe and provide stroke consultations to Beebe Hospital if Beebe agreed to refer stroke patients to Jefferson.

182.    Importantly Defendants must disregard Medicaid and Medicare laws in order to affirm the partnership as Defendants are not able to choose where stroke patients are referred.

183.    Medicare and Medicaid laws require that patient referrals from one hospital to another must be referred to the nearest appropriate facility.

184.    These laws requiring patients to be referred to the nearest appropriate facility are crucial to maintaining the cost of healthcare services for the United States tax payer.

185.    If hospitals and/or patients were permitted to choose the facility to where they were referred, the cost of healthcare would skyrocket and social programs like Medicare and Medicaid would no longer be viable.

186.    The United States Healthcare system relies on healthcare providers like Jefferson and Beebe to act in accordance with Medicare and Medicaid laws.

187.    Defendants chose to enter into a quid pro quo fraudulent agreement whereby Jefferson assisted Beebe and other hospitals in creating false medical records to circumvent, avoid and disregard Medicare and Medicaid laws in order to increase Jefferson's market share for stroke services.

188.    Because of the quid pro quo fraudulent agreement Jefferson is today able to market stroke services to a large geographic area that encompassing Pennsylvania, New Jersey, and Delaware.

189.    Defendants are in the process of vertical and horizonal marketing to enlarge this fraudulent program to increase market share for stroke services to include a larger geographical

area and to include other services other than stroke.  By way of example, Defendants are seeking

to enlarge the program to also include neurology.

**WHEREFORE,** Plaintiff, Dr. Abraham Scheer, M.D., demands all relief and damages

from Defendants, Beebe Healthcare, Beebe Medical Group, and Jefferson Health, recoverable

under law and as deemed reasonable and just by the Court.  This includes but is not limited to

judgment against the Defendants as follows:

a) That Defendants cease and desist from violating 31 U.S.C. § 3729 et seq.

b) That this Court enter judgment against Defendant in an amount equal to three times
   the amount of damages the United States has sustained because of Defendants'
   actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for
   each violation of 31 U.S.C. § 3729;

c) That Plaintiff be awarded the maximum amount allowed pursuant to § 3730(d) of the
   False Claims Act.

d) That Plaintiff be awarded all costs of this action, including attorneys' fees and
   expenses; and,

e) That Plaintiff recover such other relief as the Court deems just and proper.

**COUNT FIVE**
***DELAWARE FALSE CLAIMS AND REPORTING ACT***
***§ 1201 LIABILITY FOR CERTAIN ACTS.***
**(PLAINTIFF V. DEFENDANTS)**

190.    Plaintiff incorporates the foregoing paragraphs as if set forth at length herein.

191.    Defendants are engaged in a conspiracy to take Delaware citizens suffering from

stoke and export the patients from Delaware to Pennsylvania where Delaware citizens are

receiving treatment for stroke services.

192.    The Delaware False Claims Act holds that

i.  Any person who: (1) Knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval; (2) Knowingly makes, uses or causes to be made or used a false record or statement material to a false or fraudulent claim; (3) Conspires to commit a violation of paragraph (a)(1), (2), (4), (5), (6) or (7) of this section; (4) Has possession, custody or control of property or money used or to be used by the Government and knowingly delivers or causes to be delivered, less than all of that money or property; (5) Is authorized to make or deliver a document certifying receipt of property used or to be used by the Government and, intending to defraud the Government, makes or delivers the receipt without completely knowing that the information on the receipt is true; (6) Knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Government who may not lawfully sell or pledge the property; or (7) Knowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government shall be liable to the Government for a civil penalty of not less than $10,957 and not more than $21,916, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 2015 (28 U.S.C. § 2461, note), for each act constituting a violation of this section, plus 3 times the amount of damages which the Government sustains because of the act of that person.

193.    The court may assess not less than 2 times the amount of damages which the Government sustains because of the act of the person, if:

      i.   (1) The person committing the violation of this subsection furnished officials of the Government responsible for investigating false claims violations with all information known to such person about the violation within 30 days after the date on which the defendant first obtained the information;

      ii.   (2) Such person fully cooperated with any government investigation of such violations; and

      iii.   (3) At the time such person furnished the Government with the information about the violation, no criminal prosecution, civil action, investigation or administrative action had commenced under this title with respect to such violation, and the person did not have actual knowledge of the existence of an investigation into such violations.

194.    A person violating this subsection shall also be liable for the costs of a civil action brought to recover any such penalty or damages, including payment of reasonable attorney's fees and costs.

195.    Defendants have knowingly and intentionally entered into a quid pro quo conspiracy to move patients from the State of Delaware to Philadelphia, Pennsylvania.

**WHEREFORE,** Plaintiff, Dr. Abraham Scheer, M.D., demands all relief and damages from Defendants, Beebe Healthcare, Beebe Medical Group, and Jefferson Health, recoverable under law and as deemed reasonable and just by the Court.  This includes but is not limited to judgment against the Defendants as follows:

a)   That Defendants cease and desist from violating 31 U.S.C. § 3729 et seq.

b)   That this Court enter judgment against Defendant in an amount equal to three times the amount of damages the United States has sustained because of Defendants'

actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

c)   That Plaintiff be awarded the maximum amount allowed pursuant to § 3730(d) of the False Claims Act.

d)   That Plaintiff be awarded all costs of this action, including attorneys' fees and expenses; and,

e)   That Plaintiff recover such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relater hereby demands a trial by jury.

**DEREK SMITH LAW GROUP, PLLC**

BY:   _____*/s/ Seth D. Carson*_____
      Seth D. Carson, Esq.
      1835 Market Street, Suite 2950
      Philadelphia, PA 19103
      Phone: 215.391.4790
      Email: seth@dereksmithlaw.com
      *Attorney for Plaintiff*

DATED: December 3, 2020