**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES, ex rel** | : | **CIVIL ACTION** |
| **DR. ABRAHAM SCHEER** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **BEEBE HEALTHCARE, BEEBE** | : | |
| **MEDICAL GROUP, JEFFERSON** | : | |
| **HEALTH SYSTEM, INC., Individually** | : | |
| **and d/b/a Jefferson Health and** | : | |
| **JEFFERSON HEALTH** | : | **NO. 20-6117** |

**<u>MEMORANDUM OPINION</u>**

**Savage, J.**                                                  **January 18, 2024**

In this *qui tam* action brought under the False Claims Act ("FCA"), relator Abraham Scheer accuses Beebe Healthcare and Beebe Medical Group (collectively, "Beebe"), his former employer, of entering into an illegal agreement with Jefferson Health ("Jefferson") to defraud Medicare. The alleged agreement called for Beebe to transfer its stroke patients to Jefferson, bypassing closer hospitals, in return for Jefferson's providing Beebe free tele-stroke services. He claims Beebe medical staff falsified records to appear that treatment had not been available at a closer hospital. Based on these records, Jefferson submitted reimbursement claims to Medicare that included air ambulance costs.[1] He also claims Beebe terminated him in retaliation for his complaining to hospital management about Medicare fraud.

Scheer also asserts claims that the defendants violated the Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b), and the Physician Self-Referral Law, popularly known as the Stark Act, 42 U.S.C. § 1395nn.[2] He alleges that the transfer of patients to Jefferson was illegal payback for free use of telestroke services.

Jefferson and Beebe have moved to dismiss the Amended Complaint for failure to

state a claim for relief under Federal Rule of Civil Procedure 12(b)(6) and for failure to plead fraud with sufficient particularity under Federal Rule of Civil Procedure 9(b).[3]

We hold that Scheer has not stated plausible causes of action under the FCA, the AKS, or the Stark Act. The premise of his FCA claims has no legal or factual basis. There is no Medicare regulation that requires transfer of patients to the nearest facility. Consequently, without a substantive claim for an underlying violation of the FCA, his conspiracy claim fails. His failure to state an FCA claim dooms his claim under the Delaware False Claims and Reporting Act (DFCRA). With respect to the AKS and Stark Act claims, he has failed to allege sufficient facts to support a plausible inference that Jefferson's providing free telestroke services unlawfully compensated Beebe or its physicians. Finally, Scheer has failed to allege facts showing that his termination was linked to complaints of Medicare fraud to support his retaliation claim.

### The Amended Complaint

Relying on Section 410.40(f) of the Medicare regulations[4] covering ambulance services, Scheer claims that from 2010 to 2020 Beebe and Jefferson conspired to "circumvent Medicare and Medicaid regulations that require transfer of patients to the closest medical facility that can deliver the appropriate services."[5] Scheer alleges that Beebe automatically transferred ischemic stroke patients from its hospital in Lewes, Delaware, to Jefferson in Philadelphia, Pennsylvania, bypassing at least ten closer hospitals.[6] He asserts that Beebe transferred patients without considering a closer appropriate facility.[7] He claims that in return for the transfers, Jefferson provided Beebe with free tele-stroke and tele-neurology services through its "Jet-Stat" robot.[8]

Scheer alleges that Beebe executives directed him to automatically transfer Beebe stroke patients to Jefferson.[9] Jefferson representatives "made comments," such as, "our deal is that we get automatic transfer of all your ischemic stroke patients."[10]

Scheer claims to have "witnessed Beebe and Jefferson discuss ways to circumvent Medicare and Medicaid regulations" regarding the transfer of stroke patients.[11] He alleges he witnessed emergency room employees routinely contact Jefferson regarding neurological care.[12] He observed Beebe "refuse" to transfer patients to a closer hospital and instead "unilaterally transfer" them to Jefferson.[13]

Scheer avers that Beebe and Jefferson referred to their relationship as a "partnership" in a January 15, 2020, news article.[14] According to the article in the *Cape Gazette* generated from a Beebe press release, "since 2016, Beebe Healthcare has been a member of the Thomas Jefferson Neuroscience Network. Recently, it was announced that the partnership would be expanded to include a robotic teleconferencing unit in Beebe's Emergency Department." *Beebe Expands Partnership with Jefferson Neuroscience Network*, CAPE GAZETTE (Jan. 15 2020), https://www.capegazette.com/article/beebe-expands-partnership-jefferson-neuroscience-network/195825. It describes the Jefferson Expert Teleconsulting unit (JET) protocol as follows:

> The process starts with a phone call from Beebe's emergency team to the Jefferson Neuroscience Network to reach the on-call stroke neurologist, who connects with the Beebe team via a mobile robotic system in the emergency room. This system allows the neurologist to speak directly to the team, the patient, and family members via secure videoconference technology in order to gather information and conduct a neurologic examination on the patient. The Jefferson neurologist can also review test results and medical history. Then, the Beebe and Jefferson medical teams are able to make decisions about the best next steps for the patient, including transport to Jefferson in Philadelphia if necessary.

*Id.*

The article describes how decisions are made regarding the course of treatment that may include transfer and transport, if necessary. *Id.* In the press release, Jefferson advertises that when regional hospitals, like Beebe, join its Neuroscience Network, they have access to "[p]riority transfers to Jefferson for acutely ill patients." *Beebe Expands Partnership with Jefferson Neuroscience Network*, BEEBE HEALTHCARE (Jan. 13, 2020), https://www.beebehealthcare.org/news-release/beebe-healthcare-expands-partnership-jefferson-neuroscience-network.

Scheer cites two emails from Beebe treating physicians to administrators that he claims discussed Jefferson's accepting all Beebe stroke patients, automatic transfers to Jefferson, and Beebe's use of the Jefferson robot.[15] The first email, sent on August 11, 2020, discusses an ischemic stroke patient, "SO", whose private insurer denied coverage for transferring him from Beebe to Jefferson.[16] In it, the Patient Experience Director questions why Beebe lacked neurology coverage and why the patient was sent to Jefferson and not Christiana, a closer hospital.[17] Scheer cites a reply email on the same day from the Emergency Room Medical Director, who responded, "[m]y providers have been told to use the Jefferson robot and refer our strokes to Jefferson."[18]

In a June 5, 2020, email to all Beebe hospitalists, the Vice Chairman of the Department of Medicine wrote, "for all CVA's that present to the ER, with a wake up stroke or new symptoms of stroke less than 24 hours, with automatic admission to Jeff" and "[s]ame process as in patient with similar automatic transfer to Jeff if necessary."[19]

Scheer avers that "[a] review of Beebe's transfer logs confirms that Jefferson was given … automatic transfer." [20] They would also show that Beebe transferred as many as fourteen patients a month to Jefferson.[21]

4

Scheer claims Beebe falsified medical records "to make it look like" a closer hospital, Christiana, was contacted prior to referring the patient to Jefferson."[22] To support this allegation, he cites an email sent "sometime around November 5, 2019" from Cary Rutherford, Transfer Care Coordinator, to Beebe employees. The email discusses insurance company denials for patient transfers to Jefferson. Rutherford wrote: "Insurance companies will not pay the difference in miles."[23] For appeal purposes, Rutherford instructed staff to document in the patient's chart that they have tried to call Christiana Hospital. Rutherford concluded, the "[n]eurologist should really always call Christiana first."[24] Scheer construes Rutherford's instructions as a cover-up for the scheme because "it was known" that Beebe medical staff did not attempt to contact Christiana Hospital.[25]

Scheer avers that Jefferson "assured Beebe that they would assist Beebe in avoiding, circumventing, and defrauding Medicaid and Medicare."[26] It did this, he alleges, by "sen[ding] Beebe email notifications that if Beebe ran into issues with billing, to contact Jefferson who would assist Beebe in assuring the bills were covered."[27]

What was in it for Beebe, Scheer claims, was cost-saving for its neuro-hospitalist program because the hospital had been losing money.[28] What was in it for Jefferson was the "financial inceptive [sic]" of using its helicopter services and expanding its geographic market share for neurology services.[29]

Scheer avers that he "reported the Medicare and Medicaid fraud" to Dr. Jeffrey Hawtof (Vice President of Medical Affairs), Rick[30] Schaffner (Chief Executive Officer), Adili Khams (Chairman of Department of Medicine), Mary Francis Suter (Executive Director of Cardiac and Vascular Services), and Dr. Bobby Gulab (Senior Vice President

and Chief Medical Officer).[31] In response, Hawtof allegedly told Scheer: "It is a done deal with Jefferson."[32] He also claims that Hawtof "stated that he understood that it was not legal to automatically transfer patients from Beebe to Jefferson without any consideration for closer hospitals that could deliver the appropriate medical services" and he "acknowledged the Medicare and Medicaid fraud, however, from the time the conspiracy began to the present."[33] Schaffner reportedly became angry with Scheer and ordered him to "stop it."[34] Khams told him: "There is nothing you can do about it."[35] Suter replied: "You were outvoted, do you have anything else to say?"[36] Gulab "acknowledged" that the arrangement with Jefferson was part of Beebe's plans "for recouping [] lost revenue," in the amount of $27 million.[37]

Following his complaints, Scheer claims that he was "cut out" of meetings between Beebe and Jefferson.[38] When the neuro-hospitalist program ended in September 2020, Scheer was terminated. To support his claims that the program was cut as pretext to unlawfully terminate him, he states that Beebe later hired a new Director of Neurology, a neuro-hospitalist, and several other medical professionals.[39] At the same time, he maintains that throughout the conspiracy, Beebe sought to "scuttle" the neuro-hospitalist program.[40] Its plan was to save money by "trading free services …worth the cost of Beebe's neuro-hospitalist program in exchange for the automatic referral of" ischemic stroke patients.[41]

Beebe and Jefferson moved to dismiss the Amended Complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) and for lack of particularity required by Rule 9(b). We analyze the Amended Complaint applying the following standards.

## Standard of Review

To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).

A conclusory recitation of the elements of a cause of action is not sufficient. *Oakwood Lab'ys LLC v. Thanoo,* 999 F.3d 892, 904 (3d Cir. 2021). The plaintiff must allege facts necessary to make out each element. *Id.* (citations omitted). We disregard mere recitals of the elements of a cause of action, legal conclusions, and conclusory statements. *Id.* (citing *James v. City of Wilkes-Barre*, 700 F.3d 675, 681 (3d Cir. 2012)). The complaint must contain facts which support a conclusion that a cause of action can be established.

In considering a motion to dismiss under Rule 12(b)(6), we first separate the factual and legal elements of a claim. *Id.* (citation omitted). Accepting the well-pleaded facts as true and disregarding legal conclusions, we determine whether the alleged facts make out a plausible claim for relief. *Id.* (citing *Iqbal*, 556 U.S. at 679).

Federal Rule of Civil Procedure 9(b) requires that in "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To satisfy the particularity requirement of Rule 9(b), a complaint must state "the date, place or time of the alleged fraud or otherwise inject precision or some measure of substantiation into [the] fraud allegation[s]." *Alpizar-Fallas v. Favero,* 908 F.3d 910, 919

(3d Cir. 2018) (quoting *Frederico v. Home Depot,* 507 F.3d 188, 200 (3d Cir. 2007)).

The particularity requirement imposed by Rule 9(b) applies in FCA cases. *United States ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 242 n.9 (3d Cir. 2004). For FCA claims, a relator must "provide 'particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted.'" *Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 157-58 (3d Cir. 2014) (quoting *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir.2009)). The complaint must do more than "[d]escrib[e] a mere opportunity for fraud." *Id.* at 158.

## Analysis

### *The False Claims Act*

Scheer asserts causes of action under three provisions of the FCA: 31 U.S.C. § 3729(a)(1)(A), knowingly presenting a false or fraudulent claim for payment or approval to the government; § 3729(a)(1)(B), knowingly making a false record or statement to get a false or fraudulent claim paid or approved by the government; and § 3729(a)(1)(C), conspiring to commit an FCA violation.[42]

To state substantive causes of action under §§ 3729(a)(1)(A) and (B), a relator must allege facts showing: (1) the defendant presented a false claim for payment to the United States; (2) the defendant knew the claim was false; (3) the false claim or false statement in support of the claim was material to the payment decision; and (4) the false claim caused the government to pay the claim. *United States ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481, 487 (3d Cir. 2017). Thus, a false claim cause of action includes four elements: "falsity, causation, knowledge, and materiality." *United States ex rel. Druding v. Care Alts.*, 952 F.3d 89, 94 (3d Cir. 2020) (citing *Petratos,* 855 F.3d at

487)); *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 182 (2016).

Falsity in the context of § 3729(a)(1)(A) occurs when the defendant knowingly presents a false claim for payment to the United States for goods or services that it did not provide. *Druding*, 952 F.3d at 95 (citing 31 U.S.C. § 3729(a)(1)(A)). Falsity in a § 3729(a)(1)(B) case occurs when the defendant "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." *Id.* (quoting § 3729(a)(1)(B)). In other words, the defendant makes a false statement to support a claim for goods or services that it provided.[43]

Scheer describes the false claim scheme as follows. Between 2010 and 2020, Beebe and Jefferson made "an agreement that provided Jefferson with automatic transfer of Beebe stroke and neurology patients."[44] During this same time frame, he "witnessed" the defendants "discuss ways to circumvent Medicare and Medicare regulations."[45] "Representatives" from Jefferson "made comments" like "our deal is that we get automatic transfer of all your ischemic stroke patients."[46] Emails from Beebe's Emergency Room Medical Director, Kristie Zangari, used the terms "automatic admission" and "automatic transfer … if necessary."[47] This arrangement, he contends, enabled the defendants to defraud Medicare.

To support the inference that false claims were submitted, he asserts that he "witnessed" the transfer of patients to Jefferson without any call to Christiana "despite what the false medical records stated"[48] and he "reviewed records" that "indicate" that false claims were submitted.[49] He estimates Beebe transferred up to fourteen patients per month to Jefferson for which "there were fraudulent claims presented."[50]

The Medicare regulation at 42 C.F.R. § 410.40(f)—the only regulation he relies upon—covers the origin and destination requirements for coverage of ambulance services. It provides:

> (f) Origin and destination requirements. Medicare covers the following ambulance transportation:
>
> (1) From any point of origin to the nearest hospital, CAH, rural emergency hospital (REH), or SNF that is capable of furnishing the required level and type of care for the beneficiary's illness or injury. The hospital or CAH or REH must have available the type of physician or physician specialist needed to treat the beneficiary's condition.
>
> (2) From a hospital, CAH, REH, or SNF to the beneficiary's home.
>
> (3) From a SNF to the nearest supplier of medically necessary services not available at the SNF where the beneficiary is a resident, including the return trip.
>
> (4) For a beneficiary who is receiving renal dialysis for treatment of ESRD, from the beneficiary's home to the nearest facility that furnishes renal dialysis, including the return trip.
>
> (5) During a Public Health Emergency, as defined in § 400.200 of this chapter, a ground ambulance transport from any point of origin to a destination that is equipped to treat the condition of the patient consistent with any applicable state or local Emergency Medical Services protocol that governs the destination location. Such destinations include, but are not limited to, alternative sites determined to be part of a hospital, critical access hospital, REH (effective January 1, 2023), or skilled nursing facility, community mental health centers, federally qualified health centers, rural health clinics, physician offices, urgent care facilities, ambulatory surgical centers, any location furnishing dialysis services outside of an ESRD facility when an ESRD facility is not available, and the beneficiary's home.

42 C.F.R. § 410.40(f).

Medicare covers medical costs for ambulance services when use of other methods of transportation "is contraindicated by the individual's condition, but…only to the extent provided in regulations." 42 U.S.C. § 1395x(s)(7). Ambulance service is covered if "(1) [it] meets the medical necessity and origin and destination requirements of paragraphs (e)[51]

and (f) of this section." 42 C.F.R. § 410.40(b). The regulation provides that Medicare covers ambulance transportation "[f]rom any point of origin to the nearest hospital … that is capable of furnishing the required level and type of care for the beneficiary's illness or injury. The hospital … must have available the type of physician or physician specialist needed to treat the beneficiary's condition." *Id.* § 410.40(f)(1).

The Medicare Manual limits reimbursement for transport to the nearest appropriate facility. It provides: "An ambulance transport is covered to the nearest appropriate facility to obtain necessary diagnostic and/or therapeutic services (such as a CT scan or cobalt therapy) as well as the return transport." Medicare Benefit Policy Manual 110-02 Ch. 10, § 10.3. The reimbursement is based on the distance between the pickup point and the nearest appropriate facility—it does not include the extra distance to the farther facility. *Id.* §§ 10.3.7, 10.4.6, 20 item 5.[52] In other words, Medicare will only pay the cost of ambulance service to the closer facility and not for the extra distance.

At oral argument, Scheer's counsel could not identify any regulation or statute that mandated transfers to the closest appropriate hospital.[53] He conceded that the sole basis of his FCA claims is a violation of 42 C.F.R. § 410.40(f).[54]

Scheer misapprehends what the regulation covers. It does not—as he believes— require a hospital to transfer a patient to the nearest hospital. It governs only reimbursement for transportation services. There is no regulation or law that requires transfer to the closest hospital or facility. Thus, any agreement to transfer patients to Jefferson instead of to closer hospitals did not violate Medicare regulations and cannot supply a legal basis for Scheer's FCA substantive causes of action.

Having examined the legal basis of Scheer's FCA causes of action, we turn to the factual basis. Scheer was not in a position to know what Jefferson did. He does not know what it billed Medicare and what Medicare paid. He knows that Beebe transferred patients to Jefferson and used the telemedicine device to evaluate patients before transferring them. In short, he knew what was going on inside Beebe, but he did not know what Jefferson was doing on its end. He offers no facts showing that Jefferson submitted false claims to Medicare.

In sum, Scheer alleges that the defendants had a deal from 2010 to September 2020 to "automatic[ally] transfer" stroke patients.[55] Without any factual basis, he surmises that "the only way to make this deal [was] for Jefferson and Beebe to disregard Medicare regulations, commit fraud by falsifying medical records, and to endanger and injury [sic] patients."[56]

To satisfy the Rule 9(b) standard, Scheer must allege the "particular details" of a scheme coupled with "reliable indicia that lead to a strong inference that claims were actually submitted." *See Foglia,* 754 F.3d at 157-58 (citing *Grubbs*, 565 F.3d at 190). "Describing a mere opportunity for fraud will not suffice." *Id.* at 158. Scheer's allegations do nothing more than that. They raise only a possibility of fraud.

Scheer has not alleged facts showing that the government paid more than it would have had Beebe transferred patients to a closer facility. Where a patient could have been transferred to a closer facility where she could have been treated, Medicare reimburses for the mileage between the point of origin and the closer facility. 42 C.F.R. § 410.40(f)(1). It does not reimburse for the additional mileage to the treating facility.

There was no false claim unless Jefferson billed for the transport from Beebe to Jefferson without deducting the distance from a closer available hospital and Jefferson. Scheer has alleged no facts showing that Jefferson billed the government for the extra transportation distance from a closer appropriate facility and Jefferson.[57] He assumes it did.

Scheer's conclusory allegation that the defendants falsified records to cause Medicare to reimburse Jefferson more than it was entitled to receive is baseless.[58] He alleges no facts to support his bald statement.

Scheer's claim of fraud is based on suspicion and conjecture. He speculates that "there was no way" to automatically transfer patients from Beebe to Jefferson without committing fraud.[59] Beyond his own labels and conclusions, he asserts no facts that support his conclusory allegation that Beebe or Jefferson submitted false claims to Medicare or engaged in "practices to create false medical records in furtherance of the fraudulent billing practices."[60] The facts as alleged in the Amended Complaint, accepted as true, are insufficient to plausibly show that Jefferson and Beebe conspired to submit false claims to the government. Nor do they establish that false claims seeking reimbursement for non-reimbursable transportation charges were submitted. Therefore, we shall dismiss the substantive FCA claims.

*Anti-Kickback Statute*

Scheer alleges that the "Defendants paid and/or accepted kickbacks in a trade which was stroke patient for free stroke services."[61] He contends this arrangement violated the Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b).

13

The AKS prohibits a healthcare provider from receiving a kickback for referring a patient or compensating a healthcare provider for referring a patient who is covered by Medicare or Medicaid. *United States v. Scarfo*, 41 F.4th 136, 226 n. 118 (3d Cir. 2022), cert. denied *sub nom. Pelullo v. United States*, 143 S. Ct. 1044, (2023) (citing 42 U.S.C. § 1320a-7b(b)). It catches both the party knowingly and willfully offering or paying the kickback and the party soliciting or receiving it. 42 U.S.C. § 1320a-7b(b)(1)(A)-(2)(A).

Although the AKS does not confer a private cause of action, an AKS violation may constitute a false or fraudulent claim under the FCA. In *United States ex rel. Wilkins v. United Health Group, Inc.,* 659 F.3d 295, 311 n. 19 (3d Cir. 2011) (citing 42 U.S.C. § 1320a–7b(g)), the Third Circuit Court of Appeals explained that in the Patient Protection and Affordable Care Act of 2010, Congress amended the AKS to clarify that a claim for reimbursement that is a product of a referral prohibited by the AKS constitutes a false or fraudulent claim for purposes of the FCA.

Scheer claims that "Jefferson agreed to provide Beebe with free stroke consultations through a 'tele-stroke robot' and Beebe agreed to refer all stroke patients where there was a significant opportunity for billing to Jefferson through Jefferson's private helicopter service."[62] He alleges the tele-stroke services were remuneration in exchange for the referrals.

Only referrals exchanged for remuneration violate the AKS. 42 U.S.C. § 1320a-7b(b)(1). Remuneration is any form of compensation. It includes "any kickback, bribe, or rebate[] in return for" a referral that may be paid "directly or indirectly, overtly or covertly, in cash or in kind." *Id.*

Beebe contends that Scheer has failed to establish the scienter requirement to make out an AKS violation. He has not sufficiently alleged, it argues, that Beebe physicians "knowingly and willfully" solicited or received any remuneration in exchange for referring Medicare or Medicaid beneficiary patients to Jefferson Health.[63]

The arrangement between Beebe and Jefferson, as alleged by Scheer, allowed the Beebe and Jefferson medical teams to "make decisions about the best next steps for the patient, including transport to Jefferson in Philadelphia if necessary."[64] It was not a *quid pro quo*. It was a joint effort to provide appropriate treatment for stroke patients.

Scheer relies on an August 11, 2020, email from the Medical Director of the Emergency Room at Beebe Hospital, Dr. Kevin Bristowe, M.D., which stated: "My providers have been told to use the Jefferson robot and refer our strokes to Jefferson"; and "we have an agreement with Jefferson and they will take all our stroke patients. So hence, the patient gets the care he needs. Strong work ED team for following the process and getting the patient the care he needs!"[65] Bristowe's email does not, as Scheer contends, "confirm [the] *quid pro quo* arrangement" or "illuminat[e] the unlawful conspiracy."[66] The statement does not suggest that referrals to Jefferson were made in exchange for the robotic services. Instead, the email shows that Jefferson and Beebe were working together to provide necessary treatment to stroke patients. At oral argument, Scheer's counsel conceded that Jefferson provides a higher level of care than Beebe.[67] Beebe patients requiring a higher level of care, such as clot retrievals, must be referred to a hospital designated as a comprehensive stroke center, which Jefferson is and Beebe is not.

The conversations Scheer cites between representatives of Jefferson and Beebe discussing "the deal" or "the agreement" for "automatic acceptance" and "automatic transfer" of Beebe's neurology patients to Jefferson[68] do not support a claim that Jefferson offered Beebe free tele-stroke services in exchange for referrals. On the contrary, they describe a joint plan to provide stroke patients with necessary acute medical care.

Scheer's contention that Jefferson's free robotic services were "remuneration" for referrals is unsupported by facts. He alleges that "prior to the unlawful conspiracy, Beebe's neuro-hospitalist program cost Beebe a million dollars annually."[69] He then equates Jefferson's "free services" with "the cost of Beebe's neuro-hospitalist program."[70] He summarily concludes that the tele-stroke services program was implemented to "scuttle" the neuro-hospitalist program. Yet, both coexisted for nine years.

Stripped of its bald conclusions, the Amended Complaint does not allege that doctors referred stroke patients to Jefferson in exchange for free tele-stroke services. Thus, the AKS claim fails.

*Stark Act*

The Stark Act, 42 U.S.C. § 1395nn(a), prohibits Medicare reimbursement to a hospital "for certain services when the hospital has a financial relationship with the doctor who asked for those services, unless an exception applies." *United States ex rel. Bookwalter v. UPMC*, 946 F.3d 162, 165-66 (3d Cir. 2019). Likewise, a physician having a financial relationship with a hospital, "may not make a referral to the entity for the furnishing of designated health services" that are reimbursed by Medicare. 42 U.S.C. § 1395nn(a)(1)(A). Central to the cause of action is the referring physician's financial interest in the recipient of the referral.

A Stark Act violation may create a cause of action under the FCA. *Bookwalter,* 946 F.3d at 169. A Stark violation consists of (1) a referral; (2) a compensation arrangement between a referring physician and the hospital; and (3) a Medicare claim. *Id.* (citing *Schmidt*, 386 F.3d at 241).

Scheer claims that Beebe and Jefferson violated the Stark Act by "entering into a partnership" so that Jefferson could "market stroke services to a large geographic area that encompassing [sic] Pennsylvania, New Jersey, and Delaware."[71] He adds that the defendants "are in the process of vertical and horizonal marketing to enlarge this fraudulent program."[72] He maintains that the "Defendants specifically entered into an agreement where Jefferson agreed to partner with Beebe and provide stroke consultations to Beebe Hospital if Beebe agreed to refer stroke patients to Jefferson."[73]

Jefferson and Beebe argue that Scheer fails to state a Stark Act cause of action because he has not established the element of a direct financial relationship or an indirect compensation arrangement between them.[74] What it does show is that Jefferson and Beebe had an agreement to work together to provide stroke patients appropriate treatment.

The Stark Act and regulations prohibit compensation agreements between *referring physicians* and medical entities. The statute reads: "The term 'compensation arrangement' means any arrangement involving any remuneration between *a physician* (or an immediate family member of such physician) and an entity." 42 U.S.C. § 1395nn(h)(1)(A) (emphasis added).[75] The regulations define prohibited financial relationships as "remuneration pass[ing] between *the referring physician* … and the entity" seeking reimbursement. 42 C.F.R. § 411.354(a)(2)(i)-(ii) (emphasis added).

Scheer does not allege a financial relationship between Beebe physicians and Jefferson. Nor does he allege that Jefferson compensated any of the referring physicians. Instead, he asserts that Beebe sought to "recoup[]" lost revenue by using the free tele-stroke services in its neuro-hospitalist program.[76] He does not allege that any Beebe physician profited or otherwise benefitted from the tele-stroke services. On the contrary, he describes a scenario where the doctors would not benefit from the arrangement but instead would be harmed. He alleges that the referring doctors were to be replaced by the Jefferson tele-stroke robot.

Scheer alleges that Beebe profited from the arrangement by "getting free telehealth and neurological services."[77] Even if the Stark Act is not limited to compensation provided to referring physicians and extends to their institutional employers, Scheer still has not established the requisite financial relationship or compensation arrangement.

A "compensation arrangement" consists of remuneration between a physician and an entity, whether it is provided "directly or indirectly, overtly or covertly, in cash or in kind." 42 U.S.C. § 1395nn(h)(1)(A)-(B). An indirect compensation arrangement exists where there is (1) "an unbroken chain" of financial relationships between the referring physician and the entity; (2) the referring physician receives compensation commensurate with the volume and value of the referrals; and (3) the service provider knows, recklessly disregards, or deliberately ignores that the doctor received compensation that "varies with, or takes into account, the volume and value of referrals." 42 C.F.R. § 411.354(c)(2)(i)-(iii).

Scheer claims Jefferson provided free telemedicine stroke services to Beebe in return for Beebe referring its stroke patients to Jefferson. According to Scheer, "[p]rior to the unlawful conspiracy between Jefferson and Beebe, the neuro-hospitalist program cost Beebe Medical Group at least a million dollars ($1,000,000) annually."[78] In effect, he alleges that Jefferson, through its tele-stroke services, remunerated Beebe in the amount of $1,000,000 a year—the cost of Beebe's neuro-hospitalist program[79]—in exchange for referrals of stroke patients. The objective, he contends, was to "dismantle and scuttle the neuro-hospitalist program."[80]

The Amended Complaint is bereft of any facts from which one could infer that Beebe or its physicians received any compensation in exchange for referrals. The robot services were part of an agreement to jointly treat stroke patients.[81]

In summary, the Stark Act prohibits a physician from referring a Medicare patient to a hospital for medical services if he or she has a financial relationship with the hospital. There is nothing in the Amended Complaint showing that any referring physician had a financial relationship with Jefferson or received compensation for referrals. Nor was there a financial relationship between Jefferson and Beebe. Neither one had a financial interest in the other. Therefore, the Stark Act claim fails.

*Conspiracy 31 U.S.C. § 3729(a)(1)(C)*

To state a conspiracy claim under Section 3729(a)(1)(C), Scheer must allege: (1) an agreement to submit a false or fraudulent claim for payment, and (2) the defendants performed an act in furtherance of the agreement. *United States ex rel. Atkinson v. Pa. Shipbuilding Co.*, 473 F.3d 506, 514 (3d Cir. 2007). Scheer must also plead an underlying violation of the FCA. *See United States ex rel. Petras v. Simparel, Inc.*, 857 F.3d 497, 507

n.53 (3d Cir. 2017) (citing *Pencheng Si v. Laogai Rsch. Found.*, 71 F. Supp. 3d 73, 89 (D.D.C. 2014)).

Because Scheer has not stated a claim that the defendants submitted false claims to Medicare or violated the AKS or the Stark Act, there is no underlying violation of the FCA. Without one, he cannot state a conspiracy to violate the FCA under § 3729(a)(1)(C).

### *Retaliation – False Claims Act 31 U.S.C. § 3730(h)*

The FCA prohibits an employer from retaliating against employees who participate in investigating and prosecuting FCA violations. *Hutchins v. Wilentz, Goldman & Spitzer*, 253 F.3d 176, 185-86 (3d Cir. 2001) (citations omitted). Section 3730(h)(1) of the FCA provides:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

31 U.S.C. § 3730(h)(1).

To state a retaliation claim under the FCA, Scheer must plead facts showing that: (1) he engaged in protected conduct; (2) Beebe knew he engaged in the protected conduct; and (3) Beebe retaliated against him by taking an adverse employment action or discriminated against him; and (4) its retaliation was motivated, at least in part, by his engaging in that protected conduct. *Hutchins*, 253 F.3d at 186 (citing *United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 736 (D.C. Cir. 1998)); 31 U.S.C. § 3730(h)(1). Protected conduct is not limited to pursuing or contemplating an FCA action. It includes taking action to prevent or halt violations or reasonably perceived violations of the FCA.

*United States ex rel. Ascolese v. Shoemaker Constr. Co.*, 55 F.4th 188, 191 (3d Cir. 2022) (citing 31 U.S.C. § 3730(h)(1)).

Beebe argues that Scheer's retaliation claim fails for three reasons. First, he does not allege that he engaged in protected activity. His allegations of reports to Beebe management do not say when, how, and what specifically he reported. His allegation that he "repeatedly" reported "the Medicare and Medicaid fraud"[82] is not a factual assertion, but a conclusion.[83] Second, Scheer does not allege that he reported anything to any person involved in the decision to discontinue the neurology department, which resulted in his termination.[84] Third, Scheer fails to show that his complaining was the "but for" cause of his firing either proximally or with any other evidence, such as a pattern or antagonism.[85]

Scheer claims that Beebe "stopped treating [him] like the Director of Neurology," excluded him from emails and meetings, and ultimately terminated him.[86] He contends that these actions were in retaliation for engaging in protected conduct. Accepting Scheer's allegation that the elimination of the neurology program was pretext to terminate him and that he was excluded from decisions, emails or meetings pertinent to his role as Director of Neurology, he has alleged adverse action under the FCA.

We must now determine whether Scheer has sufficiently alleged that he engaged in protected conduct. He is not required to allege that Beebe was on notice that he was contemplating FCA litigation. *Ascolese*, 55 F.4th at 191. The FCA protection extends to internal reporting of false or fraudulent claims. *Hutchins*, 253 F.3d at 187 (citing *Yesudian*, 153 F.3d at 739). Scheer alleges baldly that he "reported the Medicare and Medicaid violations" to various upper-level management.[87] Nowhere does he specify what

violations he reported. He alleges that the "Defendants terminated [his] employment due to [his] engaging in protected activity and reporting and opposing Defendants' ongoing illegal conduct to defraud Medicare and Medicaid by submitted [sic] false bills for payment and by creating false medical records in order to make sure that fraudulent bills were paid."[88]

Scheer's broad conclusory allegations fall short of showing that he engaged in protected activity. One can only assume he is referring to the supposed violation of the transportation reimbursement regulation upon which he relies in this case. The transfer of patients was not unlawful. Nor could he have reasonably believed there was a violation because he had no basis for claiming fraudulent bills were submitted. He only assumed there must have been one.

Scheer's claim also fails because he has not alleged facts showing a connection between his complaints and his termination. A plaintiff may establish a causal connection through the "unusually suggestive temporal proximity" of the adverse action to the protected activity, "a pattern of antagonism coupled with timing," or other facts supporting an inference of causation. *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007) (internal citations omitted).

Scheer alleges that he reported "the unlawful implications associated with the automatic transfer of stroke patients" in 2011.[89] He was terminated nine years later in September 2020, when the department he headed was eliminated. His continued employment as the Director of the Neuro-Hospitalist program for nine years after allegedly reporting fraud defies any connection between his reporting fraud in 2011 and his termination in 2020.

Scheer's contradictory claims about why he was terminated militate against his retaliation claim. In an employment discrimination case against Beebe brought in the District of Delaware after this case was filed, Scheer claims that he was discriminated against based on his age and disability.[90] In this case, he claims it was because he complained of fraud. In his employment discrimination action, Scheer alleges that in May 2019 he notified Beebe of his psoriatic arthritis disability and requested accommodations and days off. He alleges Beebe subjected him to "severe and pervasive discrimination and harassment in the workplace."[91] He claims his disability was the "impetus" for his unlawful termination.[92]

Given the unspecified complaints of Medicare fraud to Beebe and the lack of a temporal connection between his alleged complaints and the termination of his job, we conclude Scheer has not stated a plausible claim of retaliation.

### Delaware False Claims and Reporting Act

Scheer alleges that the defendants violated Delaware's False Claims and Reporting Act (DFCRA) because they "have knowingly and intentionally entered into a *quid pro quo* conspiracy to move patients from the State of Delaware to Philadelphia, Pennsylvania."[93] The DFCRA is modeled after the federal FCA. *See* Del. Code tit. 6, § 1201. Delaware courts look to federal case law for guidance in interpreting the DFCRA. *See Overstock.com, Inc. v. State ex rel. French*, 234 A.3d 1175, 1184 (Del. 2020) (citing *State ex rel. Higgins v. SourceGas, LLC*, 2012 WL 1721783, at *4 (Del. Super. May 15, 2012).

Because Scheer has not stated a claim under the FCA, he fails to state a DFCRA claim. Further, he did not bring his private *qui tam* action in the name of the State of Delaware. Nor did he serve the Delaware Department of Justice with "[a] copy of the

complaint and written disclosure of substantially all material evidence and information" in his possession as required by § 1203. Del. Code tit. 6, § 1203. Accordingly, we shall dismiss his DFCRA claim.

## Leave to Amend

At oral argument, Scheer's counsel represented that he cannot add any factual allegations to his FCA, AKS, and Stark Act claims. He requested leave to amend only his retaliation claim.[94]

A second amended complaint would be futile. *See Alston v. Parker*, 363 F.3d 229, 236 (3d Cir. 2004) (explaining that leave to amend should be refused "only on the grounds of bad faith, undue delay, prejudice, or futility"). An amendment is futile if it still fails to state a claim upon which relief could be granted. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420, 1434 (3d Cir. 1997) (citing *Glassman v. Computervision Corp.*, 90 F.3d 617, 623 (1st Cir. 1996); *see also* 3 Moore's Federal Practice - Civil § 15.15 (2023).

The motions to dismiss the Amended Complaint raise the same issues that were raised in the motions to dismiss the original complaint. So, when Scheer drafted and filed his Amended Complaint, he was aware of the deficiencies the defendants asserted. His counsel acknowledged that he cannot add anything to his FCA, AKS and Stark Act causes of action, stating he cannot "plead much more facts than what's already pled."[95]

With respect to his retaliation claim, he cannot overcome the undisputed length of time between his alleged protected conduct and his termination. Any amendment would be futile. Therefore, we shall not grant leave to amend once again.

---

[1] The complaint alleges that patients were transferred for treatment at Jefferson via Jefferson helicopters. First Am. Civil Action Compl. ¶¶ 40, 137, ECF No. 30 ["Am. Compl."]. Yet, it also alleges that Beebe sought reimbursement for patient care and transport. "Dr. Scheer was involved in discussions about how Beebe could obtain reimbursement for the cost of medical care including the cost of transport." *Id.* ¶ 157.

[2] After defendants moved to dismiss the original complaint, Scheer filed an amended complaint on July 17, 2023. Am. Compl. Pursuant to the parties' stipulation, we dismissed Count II (retaliation) of the Amended Complaint against Jefferson Health and Jefferson Health System, Inc. without prejudice. Order, ECF No. 35.

At oral argument, Scheer's counsel conceded that Jefferson Health System, Inc., now known as Main Line Health System (MLHS), was improperly named as a defendant and should not be a party. Oral Argument, Nov. 6, 2023, 42:19-43:5.

[3] Def. Jefferson Health's Br. in Supp. of its Mot. to Dismiss Relator's First Am. *Qui Tam* Compl., ECF No. 43-1 [Jefferson Mot. To Dismiss"]; Mem. of L. in Supp. of Defs., Beebe Health and Beebe Medical Grp.'s Mot. to Dismiss Pl./Relator's Am. Compl., ECF No. 45-1 ["Beebe Mot. to Dismiss"].

[4] The only regulation Scheer cites is 42 C.F.R. § 410.40(f). At oral argument, his counsel could not identify any other regulation or law that required the transfer of patients to the closest appropriate hospital. Oral Argument 8:1; 10:3-12:14.

[5] Am. Compl. ¶ 71.

Scheer has alleged that the fraudulent scheme began at different times—"sometime around 2010" (*id.* ¶¶ 32, 61, 67, 70-71, 145, 290), "as early as 2011" (*id.* ¶ 314), and "around" March 2019 (*id.* ¶¶ 185-86).

[6] *Id.* ¶¶ 62-63 70.

[7] *Id.* ¶ 77.

[8] *Id.* ¶¶ 181, 252, 269.

The amended complaint refers to the telemedicine machine as "Jet-Stat." *Id.* Jefferson's helicopter transportation service is named JeffSTAT. *JeffSTAT*, Thomas Jefferson University Hospitals, https://www.jeffersonhealth.org/clinical-specialties/jeffstat (last visited Nov. 13, 2023). Jefferson's mobile robot system for acute stroke is called JET, which stands for Jefferson Expert Teleconsulting. *Beebe Expands Partnership with Jefferson Neuroscience Network,* Beebe Healthcare (Jan. 13 2020), https://www.beebehealthcare.org/news-release/beebe-healthcare-expands-partnership-jefferson-neuroscience-network (last visited Dec. 21, 2023).

[9] Am. Compl. ¶ 56.

[10] *Id.* ¶ 54.

[11] *Id.* ¶ 71.

[12] *Id.* ¶ 143.

[13] *Id.* ¶ 156.

[14] *Id.* ¶ 39.

[15] *Id.* ¶¶ 169-70.

[16] *Id.* ¶ 169.

[17] According to Scheer, Christiana Hospital, located in Newark, Delaware, is 80 miles from Beebe. *Id.* ¶ 154. He alleges that Christiana provides the same standard of care for stroke patients as Jefferson. *Id.* ¶¶ 66, 154.

[18] *Id.* ¶ 169.

[19] *Id.* ¶ 170.

[20] *Id.* ¶ 138.

[21] *Id.* ¶ 139

[22] *Id.* ¶ 221.

[23] *Id.* ¶ 215.

[24] *Id.*

[25] *Id.* ¶ 217.

[26] *Id.* ¶ 257.

[27] *Id.*

[28] *Id.* ¶¶ 191, 199-201.

[29] *Id.* ¶¶ 40, 325.

[30] The amended complaint refers to the CEO as "Rick" and "Rich" in different paragraphs of the complaint. *Id.* ¶¶ 116-22 (Rick), ¶¶ 161, 183 (Rich).

[31] *Id.* ¶¶ 106-7, 123, 161, 183. He also reported the alleged Medicare and Medicaid violations to Dr. Boskamp. *Id.* ¶¶ 161, 183.

[32] *Id.* ¶ 115.

[33] *Id.* ¶¶ 110-11.

[34] *Id.* ¶¶ 121-22.

[35] *Id.* ¶ 124.

[36] *Id.* ¶ 129.

[37] *Id.* ¶¶ 191, 196.

[38] *Id.* ¶ 184.

[39] *Id.* ¶¶ 209-10.

[40] *Id.* ¶ 198.

[41] *Id.* ¶ 201.

[42] *Id.* ¶¶ 303, 307, 313.

[43] In 2009, Congress amended the FCA to "clarify" that liability attaches when one directly presents a false claim to the government and when one acts indirectly by making a false statement material to a false claim. S. Rep. No. 110-10, 111th Cong., 1st Sess. at 11 (March 23, 2009). Sections 3729 (a)(1)(A) and 3729 (a)(1)(B) are complementary. The latter ensures that FCA liability captures subcontractors who make false statements or records material to claims presented to the government. *Id.*

[44] Am. Compl. ¶ 70.

[45] *Id.* ¶ 71.

[46] *Id.* ¶ 54.

[47] *Id.* ¶ 170.

[48] *Id.* ¶ 223.

[49] *Id.* ¶ 307.

---

[50] Omnibus Resp. in Opp'n. to Defs.' Mot. to Dismiss Pl.'s Civil Action Compl. (Doc. 43, 44, and 45) or in The Alt., Pl.'s Mot. to Amend the Compl. at 12, ECF No. 46 ["Resp."]; Am. Compl. ¶ 139.

[51] Paragraph (e) of § 410.40 delineates the medical necessity criteria and is not at issue here.

[52] The Secretary of Health and Human Services issues the Medicare Benefit Policy Manual, which interprets Medicare regulations. Chapter 10 covers ambulance services. The subsection entitled Partial Payment, states, "Where ambulance service exceeds the limits defined in §§10.3 through 10.3.7, above, refer to §20, item #5 for instructions on partial payment." Medicare Benefit Policy Manual 110-02 Ch. 10, § 10.3.7. The cited item, entitled Coverage Guidelines for Ambulance Service Claims, states:

> The A/B MAC (B) will make partial payment for otherwise covered ambulance service, which exceeded limits defined in item 6. The A/B MAC (B) will base the payment on the amount payable had the patient been transported: 5 & 6 (a) From the pickup point to the nearest appropriate facility or 5 & 6 (b) From the nearest appropriate facility to the beneficiary's residence where he or she is being returned home from a distant institution.

Id. § 20 item 5.

The subsection on Special Payment Limitations states:

> If a determination is made to order transport by air ambulance, but ground ambulance transport would have sufficed, payment for the air ambulance transport is based on the amount payable for ground ambulance transport.
>
> If the air transport was medically appropriate (that is, ground transportation was contraindicated, and the beneficiary required air transport to a hospital), but the beneficiary could have been treated at a hospital nearer than the one to which they were transported, the air transport payment is limited to the rate for the distance from the point of pickup to that nearer hospital.

Id. § 10.4.6.

[53] Oral Argument 11:24-12:9.

[54] Id. 6:3-13:8.

[55] Am. Compl. ¶¶ 61, 83.

[56] Resp. at 9.

[57] Scheer alleges that Jefferson is 45 miles farther from Beebe Hospital than Christiana Hospital. Am. Compl. ¶¶ 62, 154. Jefferson argues that by citing the driving distance, Scheer cites the wrong mileage measurement. Jefferson Mot. to Dismiss at 15 n. 16. Citing public information available on www.mapdevelopers.com, it asserts that Jefferson is only 11.5 flight miles farther than Christiana. Id.

[58] At oral argument, Scheer's counsel acknowledged that that alleged conspiracy to submit false claims is confined to the scheme for Medicare reimbursement for the excess miles between a closer hospital and Jefferson. Oral Argument 11:19-12:5.

[59] Am. Compl. ¶¶ 113, 123.

[60] Id. ¶ 155.

[61] Id. Count III ¶ 172.

[62] Id. Count III ¶ 169.

[63] Beebe Mot. to Dismiss at 39.

---

[64] Am. Compl. ¶ 170 (Zangari email excerpt); *Beebe Expands Partnership with Jefferson Neuroscience Network*, BEEBE HEALTHCARE (Jan. 13, 2020), https://www.beebehealthcare.org/news-release/beebe-healthcare-expands-partnership-jefferson-neuroscience-network.

[65] *Id.* ¶ 169.

[66] *Id.*

[67] Oral Argument 47:15-48:9

[68] Am. Compl. ¶¶ 53-56.

[69] *Id.* ¶ 199.

[70] *Id.* ¶ 201.

[71] *Id.* Count IV ¶ 188.

[72] *Id.* Count IV ¶ 189.

[73] *Id.* Count IV ¶ 181.

[74] Jefferson Mot. to Dismiss at 24-25; Beebe Mot. to Dismiss at 42.

[75] The Stark Act permits some forms of remuneration that are not relevant here. *See* 42 U.S.C. §§ 1395nn(h)(1)(A) & (C) (defining "compensation arrangement" as remuneration "other than" forgiving amounts owed for inaccurate/mistaken tests or procedures or for minor billing errors; and providing items to an entity for the collection and storing of specimens and the ordering/communicating specimen test results).

[76] Am. Compl. ¶ 196.

[77] *Id.* ¶ 278.

[78] *Id.* ¶ 199.

[79] *Id.* ¶ 201.

[80] *Id.* ¶ 198.

[81] *Id.* Count IV ¶ 181.

[82] Beebe Mot. to Dismiss at 33-34.

[83] Scheer claims the goal was to eliminate the program and he was caught up in the process, which began long before he complained about the "fraud." Oral Argument 29:16-30:19.

[84] Beebe Mot. to Dismiss at 36.

[85] *Id.* at 36-37.

[86] Am. Compl. ¶¶ 130, 234, 236, Count II ¶ 159.

[87] *Id.* ¶¶ 105-6, 108, 123, 127, 130, 160-61, 182, 192-93, 213-14, 229-30, Count II ¶ 159.

[88] *Id.* Count II ¶ 159.

[89] *Id.* ¶ 180.

[90] Compl., District of Delaware, Nov. 2, 2021, Civ. No. 21-1565 ¶ 78-79 (attached at Exhibit A to Beebe Mot. to Dismiss).

[91] *Id.* ¶ 79.

[92] *Id.* ¶ 86.

[93] Am. Compl. Count V ¶ 195.

[94] Oral Argument 65:22-66:4.

[95] *Id.* 65:23-24.